**SEBAGO, INC., et al., Plaintiffs,**

v.

**BEAZER EAST, INC., f/k/a Koppers Company, Inc., Manville Corporation and Schuller International, Inc., Defendants.**

**Robert T. KARAM, Michael Biszko and Alan Biszko d/b/a Flint Village Plaza, Plaintiffs,**

v.

**BEAZER EAST, INC., f/k/a Koppers Company, Inc., Manville Corporation and Schuller International, Inc., Defendants.**

**C.A. Nos. 96–10069–MLW, 96–10656–MLW.**

United States District Court, D. Massachusetts.

March 31, 1998.

Kenneth G. Gilman, Gilman & Pastor, Boston, MA, David J. Guin, Donaldson, Guin & Slate, P.C., Birmingham, AL, for Sebago, Inc.

Brian J. Donnell, Kevin M. Roache, Halloran & Sage, Hartford, CT, John A. Childers, Johnson & Bell, Ltd., Chicago, IL, Thomas J. Burgunder, Beazer East, Inc., Pittsburgh, PA, for Beazer East, Inc.

Thomas J. Dougherty, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, Curtis M. Canton, Paul W. Sugarman, Heller, Ehrman, White & McAuliffe, San Francisco, CA, Robert D. Batson, Schuller International, Inc., Denver, CO, for Manville Corp., Schuller International, Inc.

## MEMORANDUM and ORDER

WOLF, District Judge.

Plaintiffs Sebago, Inc. ("Sebago"), and Robert Karam, Michael Biszko and Alan Biszko doing business as Flint Village Plaza ("the Flint Village plaintiffs") brought this case, individually and as the representatives of a proposed class of plaintiffs, against defendants Beazer East, Inc. ("Beazer") and Manville Corp. ("Manville"). Plaintiffs base their action upon defendants' alleged misrepresentations regarding phenolic foam roof insulation ("PFRI"), and upon various defects in the design of PFRI, which defendants

developed, marketed and manufactured.[1] The Second Amended and Consolidated Complaint alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); RICO conspiracy, 18 U.S.C. § 1962(d); fraud; negligent misrepresentation; negligence; breach of express warranty; breach of implied warranties; violation of deceptive trade practices statutes, and strict product liability. Defendants have filed motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). For the reasons stated below, the court is denying in part and allowing in part the defendants' motions to dismiss.

More specifically, both defendants' motions to dismiss are being allowed as to plaintiffs' negligent misrepresentation claim (Count IV), negligence claim (Count V), and strict product liability claim (Count IX). Both defendants' motions to dismiss are being denied as to plaintiffs' RICO claim (Count I) and the RICO conspiracy claim (Count II). Both defendants' motions to dismiss the deceptive trade practices claim (Count VIII) are denied as to the Flint Village plaintiffs and allowed as to Sebego. Defendant Manville's motions to dismiss are being allowed as to the fraud claim (Count III) and the breach of express warranty claim (Count VI). Defendant Koppers' motions to dismiss the fraud claim (Count III) are denied as to the Flint Village plaintiffs and allowed as to Sebego. Defendant Koppers' motions to dismiss the breach of express warranty claim are denied as to Sebego and allowed as to the Flint Village plaintiffs. As a result, no party is dismissed from this action. A scheduling conference will held on May 12, 1998, at 4:00 p.m.

## I. THE ALLEGED FACTS AND PROCEDURAL BACKGROUND

The facts as presented here are drawn from the allegations in the Second Amended and Consolidated Complaint ("Compl.") and do not constitute findings by the Court. Plaintiff Sebago, a Maine corporation, owns a building which serves as its headquarters in Gorham, Maine. Compl., ¶ 21. Plaintiff Robert Karam, a resident of Massachusetts, and plaintiffs Michael and Alan Biszko, residents of Rhode Island, are the owners of Flint Village Plaza, a shopping center located in Fall River, Massachusetts. *Id.* at ¶ 22.

Defendant Beazer is a Delaware corporation with its principal place of business in Pennsylvania. *Id.* at ¶ 23. It is the successor in interest to Koppers Company, Inc., a Delaware corporation (collectively, "Koppers"). Manville Corp. and Schuller International, Inc. (collectively, "Manville") are Delaware corporations with principal places of business in Colorado. Schuller is a wholly-owned subsidiary of Manville. *Id.*

PFRI is a thermal insulation product intended for use in flat and low slope roofing systems. *Id.* at ¶¶ 1, 3. Once exposed to moisture, PFRI degrades and releases an acidic leachate, which, over time, causes severe corrosion to the metal components of roofing systems, resulting in property damage and a risk of personal injury from collapsing structures. *Id.* at ¶¶ 2, 15. The defendants knew most property owners—including plaintiffs and other class members—ordinarily rely upon their contractor, builder, roofing contractor or other "specifier" of building products (collectively, "Specifiers") to determine the appropriate type of insulation. *Id.* at ¶ 3. During the class period, defendants possessed detailed technical information indicating that PFRI was highly corrosive and unfit for its intended purposes as roof insulation. *Id.* at ¶¶ 31–32, 49. The defendants nonetheless manufactured and sold the product. *Id.* at ¶¶ 1, 2, 34–35, 48, 59–62.

The defendants also engaged in an intentional campaign of false advertising by publishing brochures that deceived the general public and the roofing industry about the properties of PFRI. *Id.* at ¶ 3. In addition, the defendants published their brochure in Sweet's Catalog, a multi-volume set of books distributed nationally to Specifiers. By failing to disclose PFRI's defects, the defendants also obtained the imprimatur of national organizations that rate building products.

---

**1.** The putative class is comprised of individuals who own structures containing PFRI that was installed between January 1, 1982 and December 31, 1992. The issue of class certification is not now before the court.

*Id.* at ¶¶ 10–13. As a result, PFRI was installed in thousands of buildings across the country. *Id.* at ¶¶ 3–6, 48.

Defendant Manville designed and supplied Koppers with fiber glass facers, which comprise the front and back of the PFRI, no later than 1985. *Id.* at ¶ 27. In addition, Manville actively worked with Koppers in the development, testing, manufacturing, marketing, and distribution of PFRI products no later than 1986. *Id.* at 28. Defendants formalized this relationship by establishing the MA–KO Insulation Company in October of 1987. *Id.* The PFRI installed on both plaintiffs' buildings contains a fiber glass facer manufactured by Manville. *Id.* at ¶ 76.

In 1987 or 1988, the prior owner of Sebago's corporate headquarters building purchased and installed PFRI in its roof as part of a renovation. *Id.* at ¶ 73. Plaintiffs allege that defendants "fraudulently induced" the manufacturer of the roof membrane of Sebago's building—Cooley Roofing Systems, Inc.—to approve the use of PFRI. *Id.* at ¶ 74. Sebago claims the PFRI and fiberglass facer caused approximately $100,000 in damage to its property. *Id.* at ¶ 75.

The Flint Village plaintiffs developed the Flint Village Plaza in Fall River, Massachusetts in 1987, and served as the general contractor. *Id.* at ¶ 78. The Flint Village plaintiffs' roofing subcontractor, Galego Roofing Systems, Inc., sent the plaintiffs a Koppers brochure. *See id.* at ¶¶ 5, 7, 8. Biszko read and reviewed the Koppers brochure sent by Galego, and reviewed the 1987 Sweet's Catalog File regarding Kopper's PFRI. *Id.* at ¶ 78. Plaintiffs allege that:

> [i]n direct reliance on the Defendants' claims as to the suitability of using their PFRI product in flat or lowslope roof systems, and in reliance on the approval given to PFRI by the manufacturer of their roof membrane …, they and their partner, Plaintiff Karam, purchased and installed PFRI in the roof assembly of the Flint Village Plaza in the fall of 1987.

*Id.* at ¶ 79. The Flint Village plaintiffs claim that the PFRI and fiberglass facer caused damages, amounting to several hundred thousand dollars, which include damage to their and their tenants' property, lost rents, and diminution in the shopping plaza's value. *Id.* at ¶ 80.

Sebago initiated this action on January 12, 1996, by filing a diversity-based nationwide class action complaint. On March 29, 1996, counsel for Sebago filed an identical action on behalf of the Flint Village plaintiffs. Defendants moved to dismiss both complaints on various grounds. By stipulation and order dated July 1, 1996, the two actions were consolidated. On July 15, 1996, plaintiffs filed an amended and consolidated class action complaint. On August 8, 1996, defendants filed motions to dismiss this complaint and to stay discovery pending resolution of the motions to dismiss. Plaintiffs filed a consolidated opposition to the motions to dismiss and motion to stay discovery on October 31, 1996, and defendants replied on December 13, 1996. The motion to stay discovery was allowed on March 5, 1997.

Following a hearing on defendants' motions to dismiss on April 16, 1997, the Court ordered the plaintiffs to file a further amended complaint by May 16, 1997, to cure defects identified by the defendants. Plaintiffs served the Complaint on May 19, 1997. Defendants' four motions to dismiss followed. A further hearing was held on January 28–29, 1998.

## II. STANDARD OF REVIEW

"In considering a motion to dismiss, a court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir.1993). "A complaint should not be dismissed for failure to state a claim unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Miranda v. Ponce Federal Bank,* 948 F.2d 41, 44 (1st Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

The standard for stating a claim upon which relief can be granted is not, however, "toothless." *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989). Plaintiffs must set forth " 'factual allegations, either direct or inferential, regarding each

material element necessary to sustain recovery under some actionable legal theory.'" *Id.* (quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir.1988)).

In addition, Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud shall be stated with particularity." Fed.R.Civ.P. 9(b). The First Circuit has interpreted this rule to require "specification of the time, place, and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228 (1st Cir.1980). "When multiple defendants are involved in cases arising in this circuit, Rule 9(b) requires that fraud be alleged particularly as to each defendant." *Goebel v. Schmid Brothers*, 871 F.Supp. 68, 73 (D.Mass.1994); *see also Fleet Credit Corp. v. Sion*, 893 F.2d 441, 444–45 (1st Cir.1990); *Kuney Int'l S.A. v. DiIanni*, 746 F.Supp. 234, 237 (D.Mass.1990).

### III. *THE RICO CLAIMS (COUNTS I and II)*

■■■ RICO's provision for civil actions provides that:

> [a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c). A plaintiff can establish standing under § 1964(c) only by demonstrating: (1) a violation of § 1962, and (2) harm "by reason of" the violation. *Sedima, S.P.R.L. v. Imrex Co. Inc.*, 473 U.S. 479, 495–497, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Pujol v. Shearson/American Express, Inc.*, 829 F.2d 1201, 1205 (1st Cir.1987). To state a claim pursuant to § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima*, 473 U.S. at 496, 105 S.Ct. 3275 (footnote omitted). The phrase "by reason of" requires that the prohibited conduct constitute both the "but for" cause (i.e., "cause-in-fact" or "factual" cause) and proximate cause of the plaintiff's injury. *Holmes*

*v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *see also Gabovitch v. Shear*, 70 F.3d 1252, 1995 WL 697319, *1 (1st Cir.1995), *cert. denied*, 516 U.S. 1175, 116 S.Ct. 1269, 134 L.Ed.2d 216 (1996). Thus, to state a civil RICO claim, a plaintiff must state facts sufficient: (i) to portray specific instances of racketeering activity within the reach of the RICO statute, and (ii) to demonstrate that the racketeering activity is both the "but-for" and proximate cause of the plaintiff's damages. *Holmes*, 503 U.S. at 268, 112 S.Ct. 1311; *Sedima*, 473 U.S. at 495–97, 105 S.Ct. 3275.

#### A. *Plaintiffs Adequately Allege a Pattern of Racketeering Activity*

An act of "racketeering activity," commonly referred to as a "predicate act," is defined to include, among other things, acts of wire and mail fraud. 18 U.S.C. § 1961(1). The plaintiffs have alleged that the defendants violated both the mail fraud statute, 18 U.S.C. § 1341, and the wire fraud statute, 18 U.S.C. § 1343. Compl., ¶¶ 113–115. A "pattern" requires, at a minimum, two acts of racketeering activity within ten years of one another. 18 U.S.C. § 1961(5); *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. 3275 (1985).

■■■ Civil RICO plaintiffs who allege mail or wire fraud must also comply with the particularity requirements of Fed.R.Civ.P. 9(b). *New England Data Services, Inc. v. Becher*, 829 F.2d 286, 292 (1st Cir.1987) (RICO complaint does not satisfy Rule 9(b)'s particularity requirement where "plaintiffs have merely stated conclusory allegations of mail and wire fraud ... with no description of any time, place or content of the communication"). Where, as here, the complaint involves multiple defendants, then "each defendants' role must be particularized with respect to their alleged involvement in the fraud." *Kuney*, 746 F.Supp. at 237; *see also Fleet Credit*, 893 F.2d at 444–45 (complaint asserting that defendants committed multiple violations of mail fraud not particular enough except with reference to those mailings identified by date and parties). In the context of RICO mail and wire fraud, however, the First Circuit has concluded that

courts should refrain from automatic dismissal of inadequate complaints, and should instead make a determination as to whether a sufficient factual basis to warrant the allowance of discovery has been alleged. *New England Data Services*, 829 F.2d at 291–92. Finally, presaging the causation analysis discussed below, it is evident that the only relevant instances of alleged mail or wire fraud in this case are those that occurred before or in 1987, the year that PFRI was installed in the roofs of the plaintiffs' buildings.

■■■■ Plaintiffs have not alleged wire fraud with particularity. To state a claim of wire fraud, the plaintiffs must allege with particularity: 1) a scheme to defraud by means of false pretenses, 2) the defendant's knowing and willful participation in the scheme with the intent to defraud, and 3) the use of interstate wire communications in furtherance of a fraudulent scheme. *United States v. Cassiere*, 4 F.3d 1006, 1011 (1st Cir.1993); *United States v. Serrano*, 870 F.2d 1, 6 (1st Cir.1989). The plaintiffs allege generally that the defendants used interstate wire communications in furtherance of a fraudulent scheme. Compl., ¶¶ 113, 115. General allegations of wire fraud, however, do not satisfy the requirements of Rule 9(b). *New England Data Services*, 829 F.2d at 292 (RICO complaint does not satisfy Rule 9(b)'s particularity requirement where "plaintiffs have merely stated conclusory allegations of mail and wire fraud … with no description of any time, place or content of the communication."). Accordingly, plaintiffs fail to state a RICO claim predicated on wire fraud.

■■■■ Plaintiffs, however, have adequately alleged mail fraud with regard to defendant Koppers. To allege mail fraud, the plaintiff must show: 1) a scheme to defraud, 2) the defendant's knowing and willful participation in the scheme with the intent to defraud, and 3) the use of the United States mail in furtherance of the scheme. *Cassiere*, 4 F.3d at 1011. The Complaint alleges with particularity that Koppers, knowingly and with an intent to defraud, mailed allegedly fraudulent brochures and other documents

on over 50 occasions. Compl., ¶ 114. The plaintiffs, therefore, allege a pattern of racketeering activity. *See Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. 3275.

■■■■ Plaintiffs have also adequately alleged mail fraud with regard to Manville. While the plaintiffs cannot attribute the particular allegations of Koppers' mail fraud to defendant Manville, *Kuney*, 746 F.Supp. at 237, the Complaint alleges sufficient acts of mail fraud by Manville itself to allege a pattern of racketeering. *See, e.g., Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. 3275. Specifically, the Complaint alleges that Manville published two research reports in industry or trade publications, which were subsequently distributed by mail throughout the United States before or in 1987. Compl., ¶ 114(b)(v) and (vi). The plaintiffs allege that the defendants undertook those two publications as part of a common scheme to defraud the public about the PFRI. In *Sedima*, the court suggested that a plaintiff may establish a pattern by demonstrating that the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 473 U.S. at 496 n. 14, 105 S.Ct. 3275 (citing 18 U.S.C. § 3575(e)). Accordingly, those two instances sufficiently allege a pattern of racketeering activity. *See id.; see also Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1130 (5th Cir.1988) ("Under RICO, each use of the mails to accomplish the same scheme is a separate predicate act."). In addition, further discovery may provide additional instances of alleged mail fraud attributable to Manville. *See New England Data Services*, 829 F.2d at 291–92.

In sum, the plaintiffs have adequately alleged a pattern of racketeering with regard to both defendants.

B. *Plaintiffs Adequately Allege an Enterprise*

■■■ RICO plaintiffs must allege that the RICO enterprise has an ascertainable structure separate and apart from the pattern of activity in which it engages.[2] *See Chang v.*

---

2. The term "enterprise" is defined in the RICO statute as including "any individual, partnership,

*Chen,* 80 F.3d 1293, 1298 (9th Cir.1996) (holding that RICO enterprise, whether formal or informal, must be "an entity separate and apart from the pattern of racketeering activity in which it engages"); *Libertad v. Welch,* 53 F.3d 428, 441–442, n. 10 (1st Cir.1995) (same); *Stephens, Inc. v. Geldermann, Inc.,* 962 F.2d 808, 815–816 (8th Cir.1992) ("[A]n enterprise cannot simply be the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these acts.") (quoting *United States v. Bledsoe,* 674 F.2d 647, 664 (8th Cir.1982)).

 Here, plaintiffs have adequately alleged a RICO enterprise with a distinct structure separate and apart from the predicate acts comprising the racketeering activity. *See, e.g, United States v. Lemm,* 680 F.2d 1193, 1201 (8th Cir.1982) (holding that an arson ring had a structure distinct from the predicate acts of mail fraud because the arson ring carried on various other activities, such as purchasing, repairing, and destroying property, and could have accomplished its fraud without the use of the mails by hand delivering its insurance claims); *United States v. Salemme,* 1997 WL 37530, *1 (D.Mass.1997) ("The function of overseeing and coordinating the commission of several different offenses and other activities on an on-going basis is adequate to satisfy the separate existence requirement.") (quoting *United States v. Console,* 13 F.3d 641, 651 (3rd Cir.1993)).

Specifically, plaintiffs allege that defendants formed an "association in fact," which includes the defendants, the MA–KO Insulation Company, which was formed in October of 1987 and not named as a defendant, as well as other individuals responsible for the research, development and marketing of PFRI. Compl., ¶ 104. More importantly, plaintiffs allege that no later than 1986—before the PFRI was installed in the plaintiffs' building—the defendants cooperated in the development and marketing of PFRI. *Id.* at ¶ 28. Plaintiffs aver that, through the defendants' cooperation and formation of the MA–KO Insulation Co., the defendants oversaw and coordinated the predicate acts of

mail fraud alleged in the complaint. *Id.* at ¶ 107. During the same time that the defendants allegedly committed the predicate acts, the defendants were also involved in "overseeing and coordinating" other activities, such as research, and technical and product development with respect to the PFRI products. *Id.* at ¶ 111. In addition, plaintiffs allege that defendants obtained technical reports concerning PFRI, concealed the true results, and published falsified results. *Id.* at ¶ 114. Because the defendants' activities had a structure separate and apart from the alleged pattern of racketeering activity, the plaintiffs have adequately alleged a RICO enterprise. *See, e.g., Salemme,* 1997 WL 37530, *1.

### C. *The Plaintiffs Adequately Allege Causation*

 The plaintiffs contend that they satisfy the standing requirements of RICO because they have alleged that the defendants' misrepresentations and omissions constituted the proximate and factual cause of their injuries. Defendants contend, however, that in the context of mail and wire fraud, a plaintiff must allege and prove actual, detrimental reliance in order to state a civil RICO claim. Neither the United States Supreme Court nor the First Circuit has rendered a decision on this precise issue. The question, then, is whether the proximate causation prerequisite requires actual, detrimental reliance in the context of RICO predicate acts of mail and wire fraud.

Several courts have addressed this question, and the majority have agreed with the defendants' position. *See, e.g., Chisolm v. TranSouth Financial Corp.,* 95 F.3d 331, 337 (4th Cir.1996); *Pelletier v. Zweifel,* 921 F.2d 1465, 1499 (11th Cir.1991); *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1311 (2nd Cir.1990); *Brandenburg v. Seidel,* 859 F.2d 1179, 1188 n. 10 (4th Cir.1988); *Blount Financial Services, Inc. v. Walter E. Heller and Co.,* 819 F.2d 151, 152 (6th Cir. 1987); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.,* 909 F.Supp. 162, 170 (S.D.N.Y.1995). In *Brandenburg,* for exam-

corporation, association, or other legal entity, and any union or group of individuals associated

in fact although not a legal entity." 18 U.S.C. § 1961(4).

ple, the Fourth Circuit began its mail and wire fraud analysis with the proposition that a causal nexus is required to state a RICO claim, and ended with the conclusion that "detrimental reliance by the victim ... is necessary to establish injury to business or property 'by reason' of a predicate act of mail fraud within the meaning of § 1964(c)." 859 F.2d at 1188 n. 10. The Fourth Circuit, therefore, interpreted proximate causation in the mail and wire fraud context to require the plaintiff to demonstrate detrimental reliance. In another civil RICO case predicated on mail fraud, the Eleventh Circuit held that the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme. *Pelletier*, 921 F.2d at 1499. The *Pelletier* court also made this statement while interpreting proximate cause principles. In addition, one district court in this circuit has broached this issue, holding that reliance must be pled. *General Electric Co. v. Lyon*, 894 F.Supp. 544, 554 (D.Mass.1995) (citing *Metropolitan Life Ins. Co. v. Ditmore*, 729 F.2d 1, 4 (1st Cir.1984)).

Other courts, however, explicitly reject the need for the civil RICO plaintiff to allege detrimental reliance on the mailed representations. *See Tabas v. Tabas*, 47 F.3d 1280, 1294 n. 18 (3d Cir.1995) (stating that "[d]efendants' assertion that the mailings involved must themselves be relied upon by the victim of the fraud in order for a RICO claim to be established is inaccurate"); *Akin v. Q-L Investments, Inc.*, 959 F.2d 521, 533 (5th Cir. 1992) ("Plaintiffs' problems of proof with respect to securities fraud do not necessarily haunt their claim of mail fraud [as a RICO predicate act] since reliance is not an element of mail fraud."); *Abell*, 858 F.2d at 1129–130 (upholding RICO claim based on mail fraud without requiring proof of reliance); *Armco Indus. Credit Corp. v. SLT Warehouse Co.*, 782 F.2d 475, 481–482 (5th Cir.1986) (same).

This court finds that the line of cases that decline to read into RICO mail fraud cases a requirement of actual, detrimental reliance are most faithful to the statute and, in any event, most persuasive.

Those courts imposing a reliance requirement were apparently influenced by their view of the nature of common law fraud, and were proceeding to read the requirements of common law fraud into the mail fraud statute. *See Prudential Ins. Co. of America v. United States Gypsum Co.*, 828 F.Supp. 287, 294 (D.N.J.1993) (citation omitted). In *Chisolm*, for example, the Court of Appeals for the Fourth Circuit reasoned that "where fraud is alleged as a proximate cause of the injury, the fraud must be a *"classic"* one. In other words, the plaintiff must have justifiably relied, to his detriment, on the defendant's material misrepresentation." 95 F.3d at 337 (emphasis added); *see also B.V. Optische Industrie*, 909 F.Supp. at 170 (reasoning that allowing plaintiffs in civil RICO action to allege mail fraud without alleging reliance would mean extending the common law definition of fraud which the court could not justify).

Under the mail fraud statute, however, reliance is not an element of the offense. As indicated earlier, a plaintiff may prove mail fraud by establishing that: (1) defendants engaged in a scheme to defraud, (2) the defendants or someone associated with the scheme used the mails for the scheme, and (3) the use of the mails was for the purpose of effectuating the scheme. *Cassiere*, 4 F.3d at 1011; *Serrano*, 870 F.2d at 6. In contrast to common law fraud, the statute creates no requirement of detrimental reliance. *See, e.g., Harkness v. Fitzgerald*, 701 A.2d 370, 372 (Me.1997); *Danca v. Taunton Sav. Bank*, 385 Mass. 1, 8, 429 N.E.2d 1129 (1982). As the First Circuit has recognized, the aim of the mail and wire fraud statutes is to punish the scheme to defraud rather than the end result. *United States v. Allard*, 926 F.2d 1237, 1242 (1st Cir.1991) ("It is not necessary to establish that the intended victim was actually defrauded.") (citations omitted).

Recognizing that the mail fraud statute does not expressly require actual reliance, some courts find a reliance requirement in the "by reason of" language of the RICO statute. *See* 18 U.S.C. § 1964(c). The "by reason of" language in RICO, however, is to be interpreted in keeping with general tort principles of proximate causation. *Holmes*, 503 U.S. at 268, 112 S.Ct. 1311. An examina-

tion of *Holmes*, the policies underlying RICO, and the fraudulent nature of mail fraud indicate that a reliance requirement should not be read into RICO.

In *Holmes*, the Court held that an alleged stock manipulation scheme that disabled two broker-dealers from meeting obligations to customers did not proximately cause the claimed injury of a plaintiff-corporation subrogated to the rights of the broker-dealers' non-purchasing customers. *Id.* at 270–71, 112 S.Ct. 1311. The alleged injury was too remote to satisfy the proximate cause requirement because only an intervening insolvency connected the RICO conspirators' acts to the customers' injuries. *Id.* at 271, 112 S.Ct. 1311.

When the Supreme Court announced the proximate cause prerequisite to § 1964(c) standing in *Holmes*, it explained that:

> [W]e use "proximate cause" to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects "ideas of what justice demands, or of what is administratively possible, or of what is administratively possible and convenient." Accordingly, among the many shapes this concept took at common law . . . was a demand for some direct relation between the injury asserted and the injurious conduct alleged.

*Id.* at 268, 112 S.Ct. 1311 (citations omitted). While the Court described proximate cause as demanding a "direct" relation between the defendant's conduct and the plaintiff's alleged injury, the Court also observed that it did not mean to preclude all possibility of recovery for injury that was caused indirectly:

> [T]he infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case. [O]ur use of the term "direct" should merely be understood as a reference to the proximate-cause enquiry that is informed by the concerns set out in the text. We do not necessarily use it in the same sense as courts before us have and intimate no opinion on results they reached.

*Id.* at 273–274 n. 20, 112 S.Ct. 1311 (internal citations omitted). The Supreme Court set forth three concerns in the text that inform the proximate cause analysis: "First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors." *Id.* at 269, 112 S.Ct. 1311. "Second, . . . recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *Id.* Third, "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.*

In the context of this case, these concerns weigh in favor of finding that the plaintiffs have standing to assert their RICO claim. Allowing Sebago and the Flint Village plaintiffs to advance their RICO claims against these defendants will not create administratively inconvenient or unmanageable litigation. Nor will these plaintiffs' claims lead to duplicative recoveries. Finally, recognizing that these plaintiffs have standing will further RICO's statutory goal of encouraging directly injured victims to act as private attorneys general to vindicate the law. Here, the plaintiffs are owners of buildings allegedly damaged by latent defects of PFRI. Because of the latent nature of the damage allegedly caused by PFRI, the former owner of Sebago's building cannot reasonably be described as having been directly injured. Rather, the plaintiffs as present owners of buildings with alleged structural damage caused by PFRI's latent defects can be said to have been "truly injured in some meaningful sense." *See Holmes*, 503 U.S. at 279, 112 S.Ct. 1311 (O'Connor, J., concurring). As such, allowing plaintiffs to press their claims here will further RICO's statutory goal of encouraging directly injured victims to act as private attorneys general to vindicate the law.

The policies on which RICO is based also inform the proximate cause analysis. In the circumstances of this case, the policies under-

lying RICO negate a requirement of reliance in the context of mail fraud predicate acts. In *Sedima*, 473 U.S. at 498–99, 105 S.Ct. 3275, the Supreme Court broadly interpreted the purposes and structure of the federal civil RICO provisions, rejecting a more restrictive interpretation. The Court found that Congress purposefully drafted a broad statute designed to encompass, prohibit, and punish activity that it defined as racketeering:

> RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, *see United States v. Turkette*, 452 U.S. 576, 586–587, [101 S.Ct. 2524, 69 L.Ed.2d 246] (1981), but also of its express admonition that RICO is to "be liberally construed to effectuate its remedial purposes," Pub.L. 91–452, § 904(a), 84 Stat. 947.

*Id.* While aware that civil RICO was being used to encompass activity well beyond the range of the "archetypal, intimidating mobster," the Supreme Court held that this reality was not inconsistent with Congress' intent. *Id.* at 499, 105 S.Ct. 3275. The Court stated that "[t]he 'extraordinary' uses to which civil RICO has been put appear to be primarily the result of the breadth of the predicate offenses, in particular the inclusion of wire, mail, and securities fraud, and the failure of Congress and the courts to develop a meaningful concept of 'pattern'." *Id.* at 500, 105 S.Ct. 3275. If this was Congress' intent, the Court held, the courts should not frustrate it. *Id.* at 499–500, 105 S.Ct. 3275 ("It is not for the judiciary to eliminate the private action in situations where Congress has provided it simply because plaintiffs are not taking advantage of it in its more difficult applications.").

The underlying predicate act, in this case mail fraud, also informs the "proximate cause" analysis. *Holmes*, 503 U.S. at 288, 112 S.Ct. 1311 (Scalia, J., concurring).[3] As mentioned previously, it is well established that the government need not prove actual detrimental reliance in criminal mail and wire fraud prosecutions. In civil RICO cases, there is no persuasive reason to add an additional requirement of detrimental reliance. The heart of this case is fraud. "[T]he general rule in fraud cases . . . is that you are liable only to an intended victim." *Matter of EDC Inc.*, 930 F.2d 1275, 1279 (7th Cir.1991). However, "[o]ne can be an intended victim without being the primary victim."[4] *Id.* Here, assuming the truth of the plaintiffs' allegations for the purposes of the motions to dismiss, the plaintiffs are among the intended victims of the defendants' alleged fraudulent scheme because the plaintiffs are the owners of the buildings that the PFRI has allegedly damaged. *See id.*

In view of both the policies of the RICO state and the mail fraud statute, the court concludes that a civil RICO plaintiff basing a claim on mail fraud need only allege "but for" causation and proximate causation to survive a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). *Holmes*, 503 U.S. at 268, 112 S.Ct. 1311. Direct, detrimental reliance is not required.

A defendant's breach of a legal duty is a cause in fact of the plaintiffs' harm if that harm would not have occurred "but for" the breach. *Id.* (citing *Restatement (Second) of Torts* § 432(1) (1965)). The second aspect of the causation analysis is proximate cause, the touchstone of which is foreseeability. The pertinent inquiry in determining the existence of proximate, or "legal," cause is "whether the conduct has been so significant and important a cause that the defendant

---

**3.** In his concurrence in *Holmes*, Justice Scalia observed that the degree of proximate causality required to recover damages caused by predicate acts of sports bribery, for example, will be quite different from the degree required for damages caused by predicate acts of transporting stolen property. *Holmes*, 503 U.S. at 288, 112 S.Ct. 1311 (Scalia, J., concurring) (statutory citations omitted).

**4.** In *Matter of EDC*, 930 F.2d 1275, 1279 (7th Cir.1991), Judge Posner illustrated this principle with the following hypothetical: Suppose you blow up a plane carrying X and Y in order to kill X. If both die in the explosion, you are just as much Y's murderer as X's, not because of the fiction of transferred intent but because you knew that Y (or any other person who might be a passenger on the plane) would die if your plot against X succeeded. *Matter of EDC* at 1279 (citations omitted).

should be held responsible." *Chisolm,* 95 F.3d at 336 (quoting Prosser & Keeton on Torts § 42, p. 272 (5th ed.1984)).

Assuming that the defendants have committed the acts alleged, however, it is for a jury apply the law of proximate causation and decide whether the plaintiffs were in the zone of foreseeable plaintiffs and whether the defendants' actions were a substantial factor in causing the plaintiffs' harm. *Peckham v. Continental Cas. Ins. Co.,* 895 F.2d 830, 837 (1st Cir.1990) (holding that questions of causation "are normally grist for the jury's mill."); *Swift v. United States,* 866 F.2d 507, 510 (1st Cir.1989) ("Application of the legal cause standard to the circumstances of a particular case is a function ordinarily performed by, and peculiarly within the competence of, the factfinder."); W. Prosser & W. Keeton, *Prosser and Keeton on Torts* 321 (5th ed.1984) (" 'proximate cause is ordinarily a question of fact for the jury, to be solved by the exercise of good common sense in the consideration of the evidence of each particular case.' ") (citation and footnotes omitted). Thus, the court cannot properly rule as a matter of law that plaintiffs were outside the zone of foreseeable plaintiffs or that the defendants' actions were not a substantial factor. To the contrary, accepting the plaintiffs' allegations as true and drawing all reasonable inferences from them, it appears that both plaintiffs were among the intended victims of the alleged fraud. For purposes of these motions to dismiss, therefore, plaintiffs adequately plead causation and state a substantive RICO claim.

### D. *Plaintiffs Adequately Allege a RICO Conspiracy*

■ Plaintiffs also adequately allege a RICO conspiracy. To state a RICO conspiracy claim pursuant to § 1962(d), the plaintiff must allege "(1) the existence of enterprise affecting interstate commerce, (2) that the defendant knowingly joined the conspiracy to participate in the conduct of the affairs of the enterprise, (3) that the defendant participated in the conduct of the affairs of the enterprise, and (4) that the defendant did so through a pattern of racketeering activity by agreeing to commit, or in fact committing,

two or more predicate offenses." *Aetna Cas. Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1561 (1st Cir.1994); *Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 41 (1st Cir.1991). Defendants contend that the plaintiffs have failed to allege the agreement necessary to plead adequately a RICO conspiracy. This argument is not meritorious.

■ The plaintiffs have stated facts from which the court could infer an agreement to commit at least two predicate acts. Compl., ¶¶ 28–31, 104–107. More specifically, the allegation that Manville actively participated with Koppers in the marketing of PFRI no later than 1986, when considered in combination with the allegation that defendants had knowledge of PFRI's alleged defects and concealed that information from the public, provides a basis to infer an agreement. Compl., ¶ 48. Accordingly, the plaintiffs RICO conspiracy claim survives the defendants' motions to dismiss.

## IV. *THE STATE LAW CLAIMS*

### A. Fraud (COUNT III)

■ To allege fraud under Massachusetts law, the plaintiff must prove that the defendants: (1) made misrepresentations of a material fact, (2) that they knew, or should have known, to be false, (3) which were made to induce the defendants to act thereon, (4) that the defendants did, indeed, act thereon, (5) in reasonable reliance that the statements were true. *Danca,* 385 Mass. at 8, 429 N.E.2d 1129; *Snyder v. Sperry & Hutchinson Co.,* 368 Mass. 433, 444, 333 N.E.2d 421 (1975); *Zimmerman v. Kent,* 31 Mass.App. Ct. 72, 77, 575 N.E.2d 70 (1991). Similarly, to allege fraud under Maine law, the plaintiff must allege: "(1) the making of a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purposes of inducing another to act upon it; and (5) justifiable and detrimental reliance by the other." *Harkness,* 701 A.2d at 372; *Grover v. Minette–Mills, Inc.,* 638 A.2d 712, 716 (Me.1994). The defendants contend that plaintiffs have failed to allege reliance with the particularity required by Rule 9(b) to state a claim under either Massachusetts or Maine law. As described below, defendants'

contention is correct with regard to Sebago, but not with regard to the Flint Village plaintiffs.

### 1. The Flint Village plaintiffs Adequately Allege Reliance on Koppers' Representations

The Flint Village plaintiffs have adequately pled direct reliance as to. defendant Koppers by alleging that: (1) their roofing sub-contractor mailed them a Koppers' brochure; (2) that Biszko as agent for the Flint Village plaintiffs reviewed the brochure and the 1987 Sweet's Catalog regarding Koppers' PFRI; and (3) that in direct reliance on defendants' claims regarding PFRI, "they and their partner . . . purchased and installed PFRI. . . ." Compl., ¶¶ 78–79. Defendants contend that Galego, a roofing subcontractor, likely made the decision to purchase and install the PFRI, not the plaintiffs. However, taking the allegations in the complaint as true and making all reasonable inferences in favor of the plaintiffs, *Watterson,* 987 F.2d at 3, the Flint Village plaintiffs unambiguously state that Biszko as agent read the Koppers' brochure in the fall of 1987, and in reliance on the representations purchased and installed the defendants' PFRI.[5] In so doing, the Flint Village plaintiffs have complied with the time, place and content requirements of Fed.R.Civ.P. 9(b). *McGinty,* 633 F.2d at 228. The Flint Village plaintiffs, therefore, have adequately pled direct reliance on Koppers' representations.

### 2. Sebago Fails to Allege Direct or Indirect Reliance on Koppers' Misrepresentations

Sebago does not allege direct reliance. A more difficult question is presented by Sebago's claims of indirect reliance. Both Maine and Massachusetts courts have recognized "[a] cause of action for misrepresentation to third parties exists only for a misrepresentation made by Defendant to such third

parties if the Defendant intended, or had reason to expect, that on repetition, the statements would influence Plaintiff's conduct to Plaintiff's detriment." *Reed Paper Co. v. Procter & Gamble Distributing Co.,* 807 F.Supp. 840, 845 (D.Me.1992) (Carter, J.) (citing *Restatement (Second) of Torts* § 533); *see also Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.,* 577 F.Supp. 1281, 1287 (D.Mass.1983). However, a claim of indirect misrepresentation requires that "the 'terms' of the alleged misrepresentation . . . 'be repeated,' or its 'substance communicated' . . . to the complaining party in order for an action to lie." *Brockton Sav. Bank,* 577 F.Supp. at 1287.

Here, Sebago fails to plead indirect reliance because the complaint fails to allege that the former owner of Sebago's building or, anyone else repeated the terms or substance of the alleged misrepresentation to Sebago. *Reed Paper,* 807 F.Supp. at 845. Thus, Sebago fails to allege adequately a state law fraud claim. *Id.*

Sebago, however, advances a more expansive theory of indirect reliance than that articulated in *Reed Paper,* 807 F.Supp. at 845. Plaintiffs contend that owners of buildings are presumed to rely on Specifiers, and that Specificers are presumed to rely on misrepresentations in building manufacturer's brochures and Sweet's Catalog. Plaintiffs submit that this "twice-presumed indirect reliance" meets the standard of justifiable and detrimental reliance required by the Maine courts. *See, e.g., Harkness,* 701 A.2d at 372; *Grover,* 638 A.2d at 716.

In support of their theory, plaintiffs urge this court to adopt the reasoning of the First Circuit's decision in *Learjet Corp. v. Spenlinhauer,* in which it was found that Kansas law did not require the precise terms of the misrepresentations to be communicated to the plaintiffs. 901 F.2d 198, 200–202 (1st Cir.1990). In *Learjet,* Spenlinhauer had purchased a plane. In a dispute concerning the

---

**5.** At oral argument, counsel for Koppers asserted that the Flint Village plaintiffs were both the general contractor for the construction of Fall River Plaza and the owners of Fall River Plaza. Counsel for Koppers contended that the plaintiffs instituted this action as owners of Flint Village Plaza, but relied upon Koppers' representation in

their role as general contractor. In the absence of any distinction in the corporate structure between the plaintiffs as owners and the plaintiffs as general contractors, the court concludes that the distinction drawn by Koppers' counsel is one without a difference.

price of modifications to the plane, Spenlinhauer alleged that Learjet had made misrepresentations to the Federal Aviation Administration (the "FAA"); and that, in reliance on those misrepresentations, the FAA certified the plane. In reliance on the FAA's certification, Spenlinhauer purchased the plane.

The First Circuit observed that the Kansas courts have held that a plaintiff may recover for fraudulent misrepresentation based on indirect reliance on the misrepresentations even where defendant's actual words were never conveyed to the plaintiff. *Id.* at 201–202 (citing *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 738 P.2d 1210, 1228 (1987); *Citizens State Bank, Moundridge v. Gilmore*, 226 Kan. 662, 603 P.2d 605 (1979)). Because the Kansas courts gave authoritative weight to the §§ 531 and 533 of the *Restatement (Second) of Torts*, the First Circuit concluded that Spenlinhauer had stated a claim under Kansas law for fraud. *Learjet*, 901 F.2d at 203.

■■■■■ A United States District Court for the District of Maine has recognized the theory of indirect reliance that requires repetition of the terms or substance of the misrepresentation. *Reed Paper*, 807 F.Supp. at 845. Although the decision in *Reed Paper* was issued by a former justice of the Maine Supreme Judicial Court ("SJC"), Judge Gene Carter, the Maine SJC has not rendered a decision on the theory of indirect reliance which Sebago proffers. "Absent controlling state court precedent, a federal court sitting in diversity may ... undertake [a] prediction 'when the course [the] state courts would take is reasonably clear.'" *Lyons v. National Car Rental Systems, Inc.*, 30 F.3d 240, 245 (1st Cir.1994) (quoting *Vanhaaren v. State Farm Mut. Auto. Ins. Co.*, 989 F.2d 1, 3 (1st Cir.1993)); *Bi–Rite Enterprises, Inc. v. Bruce Miner Co.*, 757 F.2d 440, 443 n. 3 (1st Cir.1985); *Carey v. Mt. Desert Island Hosp.*, 910 F.Supp. 7, 11 (D.Me.1995). However, "the First Circuit has also repeatedly warned that a plaintiff who ... selects a federal forum in preference to an available state forum may not expect the federal court to steer state law into unprecedented configurations." *Martel v. Stafford*, 992 F.2d 1244,

1247 (1st Cir.1993); *Catrone v. Thoroughbred Racing Associations of N.A., Inc.*, 929 F.2d 881, 889 (1st Cir.1991); *Porter v. Nutter*, 913 F.2d 37, 40–41 (1st Cir.1990).

In the instant case it is not reasonably clear that the Maine SJC would hold that a fraud claim can be maintained by a plaintiff to whom an alleged misrepresentation was not made or even repeated. Plaintiffs' reliance on the fact that Maine and Massachusetts have recognized the principles articulated in §§ 531 and 533 is unavailing. *See, e.g., McKinnon v. Tibbetts*, 440 A.2d 1028, 1031 (Me.1982) (citing § 531, Comment c (1977)); *International Totalizing Systems, Inc. v. PepsiCo, Inc.*, 29 Mass.App.Ct. 424, 560 N.E.2d 749, 754 n. 12 (1990) (citing § 531). The fact that Maine and Massachusetts courts have cited §§ 531 and 533 on a few occasions does not make it reasonably clear that they would adopt the expansive view of indirect reliance articulated by the Kansas courts. *Cf. Nycal Corp. v. KPMG Peat Marwick LLP*, 426 Mass. 491, 498, 688 N.E.2d 1368 (1998) (observing in discussion of § 552 that "[a]lthough the Restatement standard has been widely adopted by other jurisdictions, *courts differ in their interpretations of the standard.*") (emphasis added).

■■■■■ Nor do the other cases cited by the plaintiffs provide a basis to find that it is reasonably clear that the Maine SJC would concur with the view expressed by the courts in Kansas. It is true that in *Rowan County Bd. of Educ. v. United States Gypsum Co.*, 332 N.C. 1, 418 S.E.2d 648, 660–61 (1992), the North Carolina court did not require proof of the direct repetition of the terms or substance of the alleged misrepresentation. The *Rowan County* court, however, based its decision on a North Carolina state decision providing that "proof of circumstances from which the jury may reasonably infer the fact is sufficient" in proving the element of reliance. *Id.* at 661 (citing *W.R. Grace v. Strickland*, 188 N.C. 369, 124 S.E. 856, 858 (1924)). Plaintiffs in this case have not referred the court to any Maine authority that supports the same position. In addition, the California court in *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal.3d 197, 219, 197 Cal.Rptr. 783, 673 P.2d 660

(Cal.1983), in holding that direct repetition of the alleged repetition was not required, recognized that § 533 of the *Restatement (Second) of Torts* did "not quite cover the present case." Although the California Supreme Court might modify its requirements for the tort of fraudulent misrepresentation by diverting from the letter of § 533, such an action does not provide a basis to find it reasonably clear that the Maine SJC would do so.[6] Rather, the decision of the United States District Court in *Reed Paper*, 807 F.Supp. at 845, suggests that Maine SJC would not.

### 3. *Sebago Fails to Allege Reliance Based on the Defendants' Failure to Disclose Material Facts*

■■■■■■ Sebago contends that it has adequately alleged reliance by alleging that defendants failed to disclose, and indeed suppressed, information it was required to reveal. Under Maine law, "[w]hen a plaintiff alleges not an affirmative false statement, but rather a failure to disclose rising to the level of a misrepresentation, the plaintiff must prove either (1) active concealment of the truth, or (2) a specific relationship imposing on the defendant an affirmative duty to disclose." *Fitzgerald v. Gamester*, 658 A.2d 1065, 1069 (Me.1995) (citing *H.E.P. Dev. Group, Inc. v. Nelson*, 606 A.2d 774, 775 (Me.1992)). It is not clear whether the Maine courts apply the rule in *Fitzgerald* where, as here, the plaintiff alleges both affirmative false statements and a failure to disclose. Nevertheless, *Fitzgerald* is not applicable to this case.

In *Fitzgerald*, the plaintiff purchased a well from the defendants. The court held that evidence introduced at trial was sufficient to establish the defendant seller's liability for fraud because the seller did not disclose the material fact that the well had been abandoned due to contamination. The court

also found that the evidence indicated that the seller failed to disclose the known fact of the contaminated well for the purpose of inducing the plaintiff to purchase the farm. The court determined that the purchaser justifiably relied on the omission, and, consequently, suffered damages including the cost of purchasing water and other expenses connected with the well.

The rule of active concealment in *Fitzgerald*, therefore, provides a cause of action in fraud for a purchaser against a seller. 658 A.2d at 1069. Sebago, however, stands in a position once removed from the party who purchased the PFRI. Assuming the truth of Sebago's allegations for the purpose of these motions to dismiss, it is neither alleged, nor to be reasonably inferred, that the defendants actively concealed the truth about the allegedly defective quality of PFRI for the purpose of inducing Sebago to purchase its building from the building's former owner.

The lack of any direct relationship or transaction between Sebago and the defendants is also fatal to Sebago's arguments regarding partial disclosure. As the First Circuit stated in *V.S.H. Realty, Inc. v. Texaco, Inc.*, "[a]lthough there may be 'no duty imposed upon one party to a *transaction* to speak for the information of the other ... if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his knowledge. Fragmentary information may be as misleading ... as active misrepresentation, and half-truths may be as actionable as whole lies...." 757 F.2d 411, 414–15 (1st Cir.1985) (citations omitted). There is, however, no authority for the proposition that such a duty exists in the absence of a transaction between Sebago and the defendants. *See Logan Equipment Corp. v. Simon Aerials, Inc.*, 736 F.Supp. 1188, 1200 (D.Mass.1990) ("[M]ere nondisclosure generally will not

---

**6.** Plaintiffs' invocation of the "learned intermediary doctrine" is not persuasive. Under the learned intermediary doctrine, when a drug or medical manufacturer directs a warning to a "learned intermediary," such direction is a defense to a failure-to-warn products liability claim even if the learned intermediary never communicated the warning to the plaintiff. *See Mac-*

*Donald v. Ortho Pharmaceutical Corp.*, 394 Mass. 131, 135–136, 475 N.E.2d 65 (1985). Because the learned intermediary doctrine only provides a defense in failure to warn cases involving drugs and medical supplies, the plaintiffs cannot rely upon it here as a basis for this court to adopt a more expansive theory of indirect reliance than the Maine SJC has ever indicated is justified.

support any cause of action for misrepresentation."). Nor is it reasonably clear that the Maine SJC would find there to be such a duty in the circumstances alleged by Sebago. Plaintiffs have not alleged that Sebago and the defendants had a "specific relationship imposing on the defendant an affirmative duty to disclose." *See Fitzgerald*, 658 A.2d at 1069.

Accordingly, the plaintiffs have not alleged facts on which relief could be granted based upon any alleged failure to disclose material information to Sebago.

4. *Neither Plaintiff Adequately Alleges Reliance Upon Defendant Manville's Representations*

█ With regard to defendant Manville, both plaintiffs fail to allege reliance with the requisite particularity because the Second Amended and Consolidated Complaint fails to allege that they relied on any representation made by Manville. The plaintiffs cannot attribute Koppers' alleged misrepresentations to Manville in the context of Rule 9(b)'s particular pleading requirements. *Goebel*, 871 F.Supp. at 73 ("when multiple defendants are involved in cases arising in this circuit, Rule 9(b) requires that fraud be alleged particularly as to each defendant"); *Rhone v. Energy North, Inc.*, 790 F.Supp. 353, 361 (D.Mass.1991) (same). Accordingly, both plaintiffs fail to state a fraud claim with regard to Manville.

In sum, the Flint Village plaintiffs have pled direct reliance with regard to Koppers, but have failed to plead reliance with regard to Manville. Sebago has failed to plead reliance on any theory. Accordingly, the Flint Village plaintiffs' fraud claim against Manville and Sebago's fraud claims against both defendants are being dismissed.

B. Negligence (Count IV) and Strict Liability (Count IX)

█ The court need not linger long over the Flint Village plaintiffs' strict liability claim because Massachusetts does not apply § 402A of the *Restatement (Second) of Torts*, "and, consequently, there is no recovery on the basis of strict liability in tort under Massachusetts law." *Ramcharran v. Carraro*

*Graphic Equipment, Inc.*, 823 F.Supp. 63, 67 (D.Mass.1993); *see also Mason v. General Motors Corp.*, 397 Mass. 183, 190–191, 490 N.E.2d 437 (1986). Accordingly, the Flint Village plaintiffs' strict liability claim is being dismissed.

█ The defendants contend that both plaintiffs' negligence and Sebago's strict liability claims are barred by the economic loss doctrine. Under Massachusetts and Maine law, the economic loss doctrine provides that purely economic losses are not recoverable in negligence and strict liability actions in the absence of personal injury or damage to property other than the product itself. *See Jacobs v. Yamaha Motor Corp., U.S.A.*, 420 Mass. 323, 329 n. 5, 649 N.E.2d 758 (1995); *Oceanside at Pine Point Condominium Owners Ass'n. v. Peachtree Doors, Inc.*, 659 A.2d 267, 270 (Me.1995); *FMR Corporation v. Boston Edison Company*, 415 Mass. 393, 395, 613 N.E.2d 902 (1993); *Bay State–Spray & Provincetown Steamship, Inc. v. Caterpillar Tractor Co.*, 404 Mass. 103, 107, 533 N.E.2d 1350 (1989); *see also East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871–875, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (setting out economic loss doctrine followed by majority of jurisdictions including Massachusetts and Maine). Massachusetts courts have defined economic loss as "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits without any claim of personal injury or damage to other property." *Marcil v. John Deere Indus. Equip. Co.*, 9 Mass.App.Ct. 625, 630 n. 3, 403 N.E.2d 430 (1980).

The rationale underlying the economic loss doctrine is that damage to a product itself "means simply that the product has not met the customer's expectations, or, in other words, that the customer has received 'insufficient product value.' The maintenance of product value and quality is precisely the purpose of express and implied warranties." *East River*, 476 U.S. at 872, 106 S.Ct. 2295 (citation omitted). Accordingly, the economic loss doctrine draws a distinction between the situation where the injury suffered is merely the "failure of the product to function

properly," *id.* at 868, 106 S.Ct. 2295, and the situation, traditionally within the purview of tort law, where the plaintiff has been exposed, through a hazardous product, to an unreasonable risk of injury to his person or property. *See Oceanside,* 659 A.2d at 270. The Supreme Court has described the distinction between tort and contract as resting:

> on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong. The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the "cost of an injury and the loss of time or health may be an overwhelming misfortune," and one the person is not prepared to meet. In contrast, when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or, as in this case, experiences increased costs in performing a service. Losses like these can be insured. Society need not presume that a customer needs special protection. The increased cost to the public that would result from holding a manufacturer liable in tort for injury to the product itself is not justified.

*East River,* 476 U.S. at 871–72, 106 S.Ct. 2295 (citations omitted).

■ While the parties agree that both Massachusetts and Maine recognize the economic loss doctrine, they disagree over the proper definition of the relevant "product" and the "other property." The plaintiffs contend that the relevant product is the PFRI insulation and its fiberglass facer. The defendants, on the other hand, contend that the PFRI and facer are component parts of a finished product, which is the entire building.

The analysis involved in deciding whether the economic loss doctrine bars the plaintiffs' negligence and strict liability claims requires two steps. First, it must be determined what constitutes the "relevant product" and the "other property." Second, it must be determined whether the plaintiffs have al-

leged damage to the "other property." If the relevant product, within the meaning of the economic loss doctrine, is "the building," then in this case the product only caused economic damage to itself, and the economic loss doctrine forecloses recovery in negligence and strict product liability. Conversely, if the relevant product is the PFRI and facer, assuming plaintiffs's allegations that damage was caused to "other property," then the economic loss doctrine would not bar plaintiffs' negligence and strict liability claims.

### 1. Defining the Relevant Product

#### a. *Component Parts are Integrated into the Relevant Product*

■ In the context of claims based on defective components, most courts have held that the relevant "product" is the finished product into which the component is integrated. *See, e.g., King v. Hilton–Davis,* 855 F.2d 1047, 1051 (3d Cir.1988) (no recovery for damage caused by chemical to seed potatoes because plaintiffs purchased treated seed potatoes, not chemical), *cert. denied,* 488 U.S. 1030, 109 S.Ct. 839, 102 L.Ed.2d 971 (1989); *American Home Assurance Co. v. Major Tool and Mach., Inc.,* 767 F.2d 446, 447–48 (8th Cir.1985) (turbine assembler could not recover in tort from manufacturer of defective component parts because damage from those defective parts to remainder of turbine was not damage to other property); *Hadar v. Concordia Yacht Builders,* 886 F.Supp. 1082, 1097–98 (S.D.N.Y.1995) (*"Hadar I"*) (rejecting yacht owner's tort and warranty claims based on argument that defective epoxy resin caused delamination of yacht's hull because plaintiff sought only economic losses) (applying Massachusetts law); *Easling v. Glen–Gery Corp.,* 804 F.Supp. 585, 590 (D.N.J.1992) (no recovery for building damage caused by defective bricks because plaintiffs purchased completed apartment complex and not load of bricks); *Oceanside,* 659 A.2d at 271 (no recovery for building damage caused by defective windows because plaintiff owners purchased completed condominium units and not windows); *Casa Clara Condominium Ass'n, Inc. v. Charley Toppino and Sons, Inc.,* 620 So.2d 1244, 1247

(Fla.1993) (no recovery for damages caused to a condominium by defective concrete because plaintiffs purchased finished homes, not component parts).

In arriving at this result, these courts rely on the premise that one must look to the product purchased or bargained for by the plaintiff rather than the product sold by the defendant. *See, e.g., Oceanside,* 659 A.2d at 271 (holding that in cases involving component parts the court should "look to the product purchased by the plaintiff, as opposed to the product sold by the defendant, to determine whether a product has injured only itself"); *King v. Hilton–Davis,* 855 F.2d 1047, 1051 (3rd Cir.1988) ("We perceive no principled basis for affording the purchaser of a defective product greater relief against the manufacturer of a component part that has rendered a product defective than against the manufacturer of the assembled defective product. This counsels against looking to the component part to define the product and 'economic loss.' "); *Shipco 2295, Inc. v. Avondale Shipyards, Inc.,* 825 F.2d 925, 930 (5th Cir.1987) (in context of tort claim for economic loss, product means the finished product bargained for by buyer, rather than individual component parts of that product), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 701(1988); *Casa Clara Condominium,* 620 So.2d at 1247 ("The character of a loss determines the appropriate remedies, and, to determine the character of a loss, one must look to the product purchased by the plaintiff, not the product sold by the defendant."). This premise has been described as the "purchaser's perspective" or "object of the bargain test." Applying the purchaser's perspective to the present facts, the defendants contend that the relevant product is the entire building because "the PFRI is merely a component part of the roofing assemblies, which are themselves component parts of plaintiffs' own buildings." Defendants' Memorandum of Law in Support of Joint motion to Dismiss Pursuant to Rule 12(b)(6) Directed to Negligence and Warranty Issues at 6.

The plaintiffs, however, assert that the United States Supreme Court's recent decision in *Saratoga Fishing Co. v. J.M. Marti-*

*nac & Co.,* 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997) rejects the purchaser's perspective test, and replaces it with a seller's perspective. This assertion is not correct. In *Saratoga,* a primary purchaser of a ship had added to it a skiff, a fishing net, and spare parts. The vessel, with the added equipment as a part of it, was subsequently sold to a secondary purchaser, Saratoga. *Id.* at ——, 117 S.Ct. at 1785. An engine room fire led to the sinking of the ship, and a faulty hydraulic system was determined to be a significant cause of the sinking. Saratoga sued the manufacturer of the hydraulic system and the company that built the vessel. The issue before the Supreme Court was whether the added equipment constituted "other property" under *East River* so that Saratoga might recover damages for its destruction. The Court held that the added equipment was "other property":

> When a Manufacturer places an item in the stream of commerce by selling it to an Initial User, that item is the "product itself" under *East River.* Items added to the product by the Initial User are therefore "other property," and the Initial User's sale of the product to a Subsequent User does not change these characterizations.

*Id.* at ——, 117 S.Ct. at 1786. *See also Nicor Supply Ships Associates. v. General Motors Corp.,* 876 F.2d 501, 505–06 (5th Cir. 1989) (holding that a ship charterer, who adds expensive seismic equipment to a ship, may recover for its loss in a fire caused by a defective engine).

The plaintiffs in this case contend that because the defendants placed the PFRI "in the stream of commerce by selling it to an Initial User, that item is the 'product itself.' " *See Saratoga,* 520 U.S. at ——, 117 S.Ct. at 1786. The plaintiffs' argument, however, fails to distinguish between component parts and the finished product, which is, according to the Supreme Court, a distinction that continues to make a difference. *Id.* at ——, 117 S.Ct. at 1788.

Like the plaintiffs in this case, the manufacturer in *Saratoga* argued that "if a [subsequent purchaser] can recover for damage that a defectively manufactured product

causes to property added by the [initial user], than a user might recover for damage a defective component causes the manufactured product, other than the component itself." *Id.* The Court explicitly rejected this position, holding that it is not the various component parts, but the vessel itself as placed in the stream of commerce by the manufacturer and distributor that is the "product." *Id.* (citing *Shipco,* 825 F.2d at 928). Contrary to the plaintiffs' contention, therefore, in *Saratoga* the Supreme Court drew a distinction between components added to a product by a manufacturer before the product's sale to a user, *see, e.g., King,* 855 F.2d at 1051 (Pennsylvania law); *Shipco,* 825 F.2d at 930 (federal maritime law), and those items added by a subsequent user to the manufactured product, *see, e.g., Nicor Supply Ships Assocs. v. General Motors Corp.,* 876 F.2d 501 (5th Cir.1989). Citing *East River,* the Court concluded that, because almost all machines are made up of components, to define "other property" differently would "require a finding of 'property damage' in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability." *Id.* (quoting *East River,* 476 U.S. at 867, 106 S.Ct. 2295).

Upon review of the jurisprudence of the economic loss doctrine, this court finds that it is appropriate to define the relevant product from the "purchaser's perspective." *See, e.g., Oceanside,* 659 A.2d at 271. Because Sebago purchased a building from its former owners, the building is the relevant product for purposes of the economic loss doctrine. Compl., ¶ 74. Likewise, the Flint Village plaintiffs purchased a completed building.[7] *Id.* at ¶ 78.

Seeking to draw a meaningful distinction between the PFRI and the building into which the PFRI was integrated, the plaintiffs argued at the January 28–29, 1998 hearing

that a correct application of the purchaser's perspective indicates that the PFRI is the relevant product because the PFRI in the plaintiffs' roofs was installed as part of a renovation project. Specifically, plaintiffs argue that the object of the bargain had been PFRI as a replacement part, not a complete building. The Third Circuit recently rejected this argument in *Sea–Land Service, Inc. v. General Elec., Co.,* 134 F.3d 149 (3d Cir. 1998). In *Sea–Land,* the plaintiff ship company alleged that a replacement component part of a diesel engine, a connecting rod, was defective and claimed the profits it lost while the ship was inoperable. *Id.* at 154. The issue was whether replacement parts should be viewed as integrated into the engine for purposes of the economic loss doctrine. The plaintiff argued that upon its 1990 purchase of a connecting rod, it already owned the engine as preexisting property, purchased in 1988. The 1990 property, the rod, the plaintiff contended, caused damage to the 1988 property, the engine, and therefore the economic loss doctrine did not foreclose recovery in negligence and strict liability.

In rejecting the plaintiff's argument, the *Sea–Land* court held that there was not "any rational reason to deviate from the integrated product rule simply because the defective component happens to be a replacement part instead of the part originally supplied with the product." *Id.* at 154 (citing *Saratoga,* 520 U.S. at ——, 117 S.Ct. at 1788). The court reasoned that because all "commercial parties are aware that replacement parts will be necessary, the integrated product should encompass those replacement parts when they are installed in the engine." *Id.* (citing *Exxon Shipping Co. v. Pacific Resources, Inc.,* 835 F.Supp. 1195, 1201 (D.Haw.1993) (rejecting the distinction between a separately purchased replacement part and the originally supplied components as irrelevant to determining whether "other property" has been damaged)).

7. Flint Village Plaza's roof was assembled by a roofing subcontractor, Galego Roof Systems, Inc., from various component parts, including PFRI and a roof membrane manufactured by Goodyear. Compl., ¶¶ 78–79. The fact that the Flint Village plaintiffs evidently acted both as owners and general contractors is immaterial for purposes of this case. The Flint Village plaintiffs

as owners or as the general contractor could have obtained warranties for the roof from Galego Roof Systems. In addition, the fact that the Flint Village plaintiffs have failed to allege contractual privity with the defendants suggests that they did not purchase the PFRI, but rather purchased a completed building.

The reasoning of *Sea–Land* is persuasive and applicable to the facts of this case. Here, the PFRI was purchased to be installed and to become integrated with the building. It is a component of the building, and has no use to the plaintiffs otherwise. Moreover, in purchasing and installing replacement parts, the parties could have, as with the original purchase, negotiated the terms of the sale and of any warranties. *See American Home*, 767 F.2d at 448 (entire turbine was "single product fabricated under a series of subcontracts"); *Exxon*, 835 F.Supp. at 1201 ("spare and replacement parts may … be part of the 'object of the bargain' regardless of whether or not they are purchased under the same contract"). Accordingly, the result of the purchaser's perspective test is the same whether the PFRI is viewed as a component part or a replacement component part.

In addition, the plaintiffs base their assertion that the economic loss doctrine does not apply in this case by reference to several Massachusetts Superior Court decisions and one Appeals Court decision. These cases do not indicate, however, that it is reasonably clear that the highest courts of Maine and Massachusetts would disagree with this court's analysis.

*Seal Harbor III Condominium Trust v. Kaplan*, No. 93–04535 (Suffolk Sup.Ct. Dept. May, 1, 1997) and *Gailunas v. SPOR Management Associates, Inc.*, No. 92–2626 (Norfolk Sup.Ct. Dept. Jan. 14, 1997) are unavailing due to their reliance on a bailment case, *Priority Finishing Corp. v. LAL Const. Co. Inc.*, 40 Mass.App.Ct. 719, 667 N.E.2d 290 (1996). In *Priority Finishing*, the court held that the economic loss doctrine did not apply where the plaintiff-bailee's pecuniary losses are derived from physical harm "to property for which the plaintiff has a right to recover." In rejecting the economic loss doctrine, the court reasoned that "[a] bailee is entitled to sue a third party who causes injury to or the loss of the bailed property in its possession." *Id.* at 721, 667 N.E.2d 290. Because the present case does not involve a bailment of

property, the decisions in *Seal Harbor* and *Gailunas* do not provide a sound basis for this court to abandon or modify the economic loss doctrine.

The Massachusetts Appeals Court decision in *Seal Harbor III Condo. Trust*, No. 95–J–185 (Mass.App.Ct. April 4, 1995) stated in *dicta* that "no appellate authority in Massachusetts discuss[es] whether the economic loss rule applies to construction." Although the instant case involves construction, the heart of it is an allegedly defective product. Illustrative of this point is the fact that the plaintiffs have grounded their claims on a number of bases, including product liability and breach of express and implied warranties. It is not reasonably clear that the Massachusetts Supreme Judicial Court ("the Massachusetts SJC") would exclude construction cases from the economic loss doctrine. Rather it appears more likely that the Massachusetts SJC would follow the example of other jurisdictions that have applied the economic loss doctrine to construction cases. *See, e.g., Easling*, 804 F.Supp. at 590; *Casa Clara Condominium*, 620 So.2d at 1247. In addition, the fact that the plaintiffs have brought this case against a component-part manufacturer rather than the general contractor, builder, or engineer suggests it is not, in essence, a construction case.[8] Finally, *Gateway Condominium Trust v. Clinton*, No. 94–1931–A, 1996 WL 655784 (Essex Sup. Ct. Dept. Nov. 7, 1996) is factually inapposite because its decision turned on the provision of professional services, and did not involve an allegedly defective product.

In sum, the court finds that the purchaser's perspective is the appropriate means to determine the relevant product in component part cases. Applying the purchaser's perspective, the relevant products here are the plaintiffs' buildings, not the PFRI.

b. *Massachusetts and Maine Do Not Recognize an Unreasonable Risk Exception to the Economic Loss Doctrine*

▬ Plaintiffs also contend that the economic loss doctrine should not apply in this case because the PFRI installed in their

---

**8.** As the *Oceanside* court noted, 659 A.2d at 271 n. 7, some courts have permitted recovery for damage to buildings under a theory of strict

liability where the plaintiff brought claims against the builder or contractor.

buildings poses an unreasonable risk of harm. Compl., ¶¶ 55, 165, 166. Plaintiffs allege, for example, that a non-party roof worker fell through a PFRI-constructed roof, sustaining personal injury. *Id.* at ¶ 56.

Neither Maine nor Massachusetts has recognized plaintiffs' unreasonable risk theory. *See Bay State–Spray,* 404 Mass. at 107, 533 N.E.2d 1350 ("when economic loss is the only damage claimed, recovery is not allowed in tort-based strict liability ... or negligence"); *Oceanside,* 659 A.2d at 271 (citing with approval *Casa Clara Condominium,* 620 So.2d at 1247 (stating that "the mere possibility that the exploding concrete will cause physical injury is [not] sufficient reason to abrogate the economic loss rule.")). *But see Seal Harbor III,* No. 93–04535 (Suffolk Sup.Ct. Dept. May, 1, 1997) (relying on bailment case to hold economic loss doctrine did not bar plaintiff's claims and stating without comment "[t]he summary judgment record also suggests a possible risk of personal injury from structural or material failure").

In addition, the overwhelming majority of decided cases have rejected the adoption of an "unreasonably dangerous," "unduly hazardous" or "sudden and calamitous event" exception. *See, e.g., Bocre Leasing Corp. v. General Motors Corp.,* 84 N.Y.2d 685, 691–92, 621 N.Y.S.2d 497, 645 N.E.2d 1195 (1995); *Detroit Edison Co. v. NABCO, Inc.,* 35 F.3d 236, 242 (6th Cir.1994) (Michigan does not recognize "unduly dangerous" exception); *Dakota Gasification Co. v. Pascoe Bldg. Systems,* 91 F.3d 1094, 1097–1100 (8th Cir.1996). *See also* D'Angelo, Christopher, *The Economic Loss Doctrine: Saving Contract Warranty law From drowning in a Sea of Torts,* 26 U. TOL. L. REV. 591, 608 (1995) (only *eight* states had created an "unreasonably dangerous" exception to the economic loss rule as of 1995).

Several cases, cited by plaintiffs, have recognized such an exception to the economic loss rule. The exception appears to be a narrow one, however, and has been limited so far to cases involving asbestos-infested buildings and walls that suddenly collapsed. *See Tioga Public School Dist. v. United States Gypsum Co.,* 984 F.2d 915, 919 (8th Cir.1993) (asbestos); *City of Greenville v. W.R. Grace & Co.,* 827 F.2d 975, 978 (4th Cir.1987) (same); *Roseville Plaza Ltd. Partnership v. United States Gypsum Co.,* 811 F.Supp. 1200, 1205 (E.D.Mich.1992) (same); *Detroit Bd. of Educ. v. Celotex Corp.,* 196 Mich.App. 694, 703–04, 493 N.W.2d 513 (1992) (same); *Trustees of Columbia University v. Gwathmey Siegel and Associates,* 192 A.D.2d 151, 601 N.Y.S.2d 116 (N.Y.App.Div.1993) (defective building facade); *Trustees of Columbia University v. Mitchell/Giurgola Associates,* 109 A.D.2d 449, 492 N.Y.S.2d 371, 376 (N.Y.App.Div.1985) (same).

Upon review of the relevant decisions, and in recognition that the majority of state courts have not adopted an unreasonably dangerous exception to the economic loss doctrine, the court concludes that it is not reasonably clear that the highest courts of Maine and Massachusetts would hold that such an exception exists.[9]

### 2. *Plaintiffs Do Not Allege Damage to "Other Property"*

Because plaintiffs' buildings are the relevant products, the plaintiffs have not identified any "other property" that has been injured. More specifically, the plaintiffs seek damages for (1) physical damage to various parts of their buildings, including the roofing systems, (2) physical damage to tenants' property, resulting in claims by tenants and lost rents, and (3) diminution in market value of the property and other economic damages. Compl., ¶¶ 75, 80. These damages are all

---

**9.** Plaintiffs contend that neither Maine nor Massachusetts has encountered a case with facts that would have warranted consideration of an unreasonably dangerous exception. The plaintiffs in this case, however, have failed to allege they have sustained an actionable personal injury, and seek only damages resulting from alleged latent defects. Under the circumstances, the mere possibility of injury occurring at the plaintiffs' building is insufficient to create an exception to the economic loss doctrine. *See Morris v. Osmose Wood Preserving,* 340 Md. 519, 667 A.2d 624, 633 (1995) ("[M]ere possibilities are legally insufficient to allege the existence of a clear danger of death or serious personal injury .... To lower the threshold to encompass mere 'possibilities' of injury, as presented in this case ... is to 'cheapen' the legitimacy of the exception to the economic loss rule and thereby invite an avalanche of such tort claims in future cases.").

damages to the "relevant product," not damage to "other property." *See Marcil,* 9 Mass.App.Ct. at 630 n. 3, 403 N.E.2d 430 (1980) (defining economic loss as "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits without any claim of personal injury or damage to other property"). In addition, because the Flint Village plaintiffs have not alleged personal injury to themselves or damage to "other property" that they own, they cannot assert a claim based on alleged damage to property belonging to their tenants. *MacGlashing v. Dunlop Equip. Co., Inc.,* 89 F.3d 932, 937–38 (1st Cir.1996) ("RPM alleges no direct damage or injury to itself. The argument that RPM is entitled to relief from the contract it negotiated with Dunlop hinges entirely on the physical injury its employee, Charles MacGlashing, sustained. RPM has not made *the showing of injury or damage to itself as Massachusetts law requires.*") (citation omitted and emphasis added).

Accordingly, the plaintiffs' negligence claim and strict liability claim are being dismissed.

## C. NEGLIGENT MISREPRESENTATION (COUNT IV)

 Like fraud, a claim of negligent misrepresentation requires plaintiffs to plead reliance with particularity. *See, e.g., Devine v. Roche Biomedical Lab.,* 637 A.2d 441, 445 (Me.1994) ("justifiable reliance"); *Robertson v. Gaston Snow & Ely Bartlett,* 404 Mass. 515, 523, 536 N.E.2d 344, *cert. denied,* 493 U.S. 894, 110 S.Ct. 242, 107 L.Ed.2d 192 (1989) (requiring "reasonable reliance"); *Restatement (Second) of Torts* § 552. Accordingly, for the reasons previously described in the discussion on fraud, *supra,* Part IV.A., only the Flint Village plaintiffs' negligent misrepresentation claim survives the defendants' motion to dismiss Count IV based on a lack of reliance. The defendants contend, however, that the economic loss doctrine bars

the Flint Village plaintiffs' negligent misrepresentation claim. This contention is correct.

 Massachusetts has not expressly decided whether the economic loss doctrine bars claims of negligent misrepresentation where the damages result from a defective product. Accordingly, the issue once again is whether it is reasonably clear that the Massachusetts SJC would hold that the economic loss doctrine bars the Flint Village plaintiffs' negligent misrepresentation claim. *See Lyons,* 30 F.3d at 245; *Martel,* 992 F.2d at 1247.

"There is substantial disagreement among the courts as to whether a claim for negligent misrepresentation should be recognized as an exception to the economic loss doctrine." Reeder R. Fox & Patrick J. Loftus, *Riding the Choppy Waters of East River: Economic Loss Doctrine Ten Years Later,* 64 Def. Couns. J. 260, 268 (1997). The dilemma may stem from the tension between the economic loss doctrine's bar against purely economic losses and the express provision of damages for pecuniary losses found in Restatement (Second) of Tort § 552.[10] Like many other jurisdictions, Massachusetts models its tort of negligent misrepresentation on § 552. *See e.g., Lawton v. Dracousis,* 14 Mass.App.Ct. 164, 171, 437 N.E.2d 543 (1982) (citing *Restatement (Second) of Torts* § 552(1)), *rev. denied,* 387 Mass. 1103, 440 N.E.2d 1177 (1982).

Other jurisdictions' decisions addressing this issue have resolved the apparent contradiction between the economic loss doctrine and § 552 in two ways. First, many jurisdictions appear to hold that the economic loss doctrine bars all claims of negligent misrepresentation. *See, e.g., Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 620 (3rd Cir.1995) ("[C]ourts in jurisdictions which have adopted the economic loss doctrine routinely have declined to carve out an exception for claims of negligent misrepresentation"); *Apollo Group, Inc. v. Avnet,*

---

**10.** Section 552 of the *Restatement (Second) of Torts* provides that:

One who, in the course of business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in

their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Inc.,* 58. F.3d 477, 480 (9th Cir.1995) (applying Arizona law) (holding that negligent misrepresentation is not an exception to the economic loss doctrine); *Bailey Farms, Inc. v. NOR–AM Chem. Co.,* 27 F.3d 188, 191 (6th Cir.1994) (applying Michigan law) (same); *Eagle Traffic Control v. Addco,* 882 F.Supp. 417, 419 (E.D.Pa.1995) (applying Pennsylvania law) (same); *National Steel Erection, Inc. v. J.A. Jones Const. Co.,* 899 F.Supp. 268, 274 (N.D.W.Va.1995) (same). These courts summarily characterize negligent misrepresentation as sounding in tort, and apply the economic loss doctrine without discussion.

Second, other jurisdictions have created narrow exceptions to the economic loss doctrine's ban against negligent misrepresentation claims for cases that do not involve an allegedly defective product. In *In re Chicago Flood Litig.,* for example, the Illinois Supreme Court recognized an exception to the economic loss doctrine where the plaintiff's damages are proximately caused by a negligent misrepresentation made by a defendant in the business of supplying information for the guidance of others in their business transactions ("the business information exception"). 176 Ill.2d 179, 223 Ill.Dec. 532, 680 N.E.2d 265, 268–69 (1997) (citing *Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443, 452 (1982)). *See also In re Delmarva Secur. Litig.,* 794 F.Supp. 1293 (D.Del.1992) (allowing recovery for economic loss due to misrepresentation in context of securities law). These courts evidently reconcile the tension between the economic loss doctrine and § 552 by drawing a distinction between products and services.[11] The common thread linking the cases in this second category is that they do not involve an allegedly faulty product.

■ Upon review of the forgoing authorities, the court concludes that it is reasonably clear that Massachusetts would adopt some version of the second category of decisions, which create an exception to the economic loss doctrine's ban against negligent misrepresentation claims, but only for cases that do not involve an allegedly defective product. A review of the Massachusetts case law reveals that the courts have exempted from the economic loss doctrine only those negligent misrepresentation claims stemming from the provision of services. *See, e.g., Arthur D. Little Intern., Inc. v. Dooyang Corp.,* 928 F.Supp. 1189, 1204 (D.Mass.1996) (misrepresentations concerning risks of investment); *Stone/Congress v. Town of Andover,* 6 Mass. L.Rptr. 330, 1997 WL 11737, at *3–4 (Mass.Super.1997)(misrepresentations in architect's plans); *Danca,* 385 Mass. at 9–10, 429 N.E.2d 1129 (1982)(misrepresentations made in mortgage documents); *Craig v. Everett M. Brooks Co.,* 351 Mass. 497, 501, 222 N.E.2d 752 (1967) (negligent "form of representation" involving engineer's placement of survey stakes); *Frank Cooke, Inc. v. Hurwitz,* 10 Mass.App.Ct. 99, 109–11, 406 N.E.2d 678 (1980) (discussing claim of accounting malpractice resulting in economic loss but barred by statute of limitations). While these decisions appear to rely solely on the language of § 552, none of the decisions involved a fact pattern where, as here, the plaintiff sought damages stemming from a defective product. In addition, the plaintiffs have pointed to no Massachusetts decision, nor could the court find one, where a plaintiff recovered purely economic loss for a negligent misrepresentation claim where the damages stemmed from an allegedly defective product.

The policies underlying the economic loss doctrine are also directly implicated where, as here, the alleged damages stem from a defective product. *See, e.g., East River,* 476 U.S. at 872, 106 S.Ct. 2295 (stating that rationale underlying the economic loss doctrine is that damage to a product itself means that the product has not met the customer's expectations and that maintenance of product value and quality is precisely the purpose of express and implied warranties). Finally,

**11.** Some jurisdictions have expressly limited the economic loss doctrine to product liability claims. *See, e.g., Cargill Inc. v. Boag Cold Storage Warehouse Inc.,* 71 F.3d 545, 550–51 (6th Cir.1995). Others jurisdictions, however, reject that approach and apply the doctrine beyond the realm of product liability. *See, e.g., Sun Co. v. Badger Design & Constructors Inc.,* 939 F.Supp. 365, 372 (E.D.Pa.1996).

plaintiffs should not be able to circumvent the policies of the economic loss doctrine by recasting a negligence or product liability claim as a claim for negligent misrepresentation. As one commentator notes, "[w]ith increasing frequency, plaintiffs are presenting their negligence claims in the form of claims for negligent misrepresentation in an attempt to circumvent the economic loss rule." *See* Fox & Patrick, *supra*, at 268.

It is not necessary to predict the specific parameters of the exception that the Massachusetts SJC would likely adopt if confronted with the facts of this case. Rather, it is reasonably clear that the Massachusetts SJC would hold that the economic loss doctrine bars negligent misrepresentation claims where the damages stem from an allegedly defective product. Because the Flint Village plaintiffs have alleged that defective PFRI caused their damages, their negligent misrepresentation claim is being dismissed.

### D. The Warranty Claims (Counts VI and VII)

#### 1. *A Lack of Privity Bars a Commercial Plaintiffs' Breach of Warranty Claims Under Massachusetts Law*

 Defendants contend that the Flint Village plaintiffs' breach of express and implied warranty claims are barred by a lack of reliance and privity.[12] This contention, too, is correct. Express warranties are created pursuant to M.G.L. ch. 106, § 2–313. A warranty that goods are merchantable is implied in every sale of goods. M.G.L. ch. 106, § 2–314. Preliminarily, for the reasons described in the discussion of the fraud claim, *supra*, Part IV.A., the Flint Village plaintiffs' breach of express warranty claim against Manville is being dismissed because the plaintiffs do not allege any representations attributable to Manville that could constitute the basis of an express warranty.

Relying on M.G.L. ch. 106, § 2–318, plaintiffs contend that privity is not required to maintain their remaining warranty claims. Section 2–318 provides in pertinent part that:

> Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer, seller, lessor or supplier of goods to recover damages for breach of warranty, express or implied, . . ., although the plaintiff did not purchase the goods from the defendant if the plaintiff was a person whom the manufacturer, seller, lessor or supplier might reasonably have expected to use, consume or be affected by the goods. . . . All actions

---

**12.** The parties evidently assume that article 2 of the Uniform Commercial Code ("UCC"), which relates to "transactions in goods," M.G.L.A. ch. 106, § 2–102, applies to this case. General Laws ch. 106, § 2–105 defines "goods" as "all things . . . which are movable at the time of identification to the contract for sale." It is not clear from the complaint, however, that the contracts or underlying contracts in this case called for the sale of goods. *See* M.G.L.A. ch. 106, § 2–105. In *White v. Peabody Construction Co.*, 386 Mass. 121, 132, 434 N.E.2d 1015 (1982), the Massachusetts SJC held that the UCC does not apply to "the sale of structures attached to realty." *See also Cambridge Plating Co., Inc. v. Napco, Inc.*, 991 F.2d 21, 24 (1st Cir.1993). The claims in *White* were based "not [on] contracts for the sale of bricks or window frames or caulking material but for the construction and sale of a building." 386 Mass. at 133, 434 N.E.2d 1015.

In arriving at its conclusion, the *White* court ruled that "[c]ontacts whose predominant factor, thrust, or purpose is the rendition of services" are outside the scope of the UCC. *Id.* at 131–32, 434 N.E.2d 1015. It follows that, if the "rendition of services" is not at the heart of a mixed contract, the UCC does govern. *See USM Corp. v. Arthur D. Little Systems, Inc.*, 28 Mass.App.Ct.

108, 119, 546 N.E.2d 888 (1989) (contract for computer system involving both sale of goods and delivery of services governed by UCC). In this case, however, it is not clear whether the contracts at issue called for the erection of buildings and the sale of a completed building, *see White*, 386 Mass. at 132, 434 N.E.2d 1015, or whether the contract listed movable items, *see Burnham v. Mark IV Homes, Inc.*, 387 Mass. 575, 441 N.E.2d 1027, 1031 (1982) (modular homes are "goods" within coverage of UCC).

Where the UCC does not apply, breach of warranty claims are governed by the common law. Common law breach of warranty claims require privity. *Chestnut Hill Dev. Corp. v. Otis Elevator Co.*, 653 F.Supp. 927, 932 (D.Mass.1987)(citing cases).

To determine whether the contracts of the entire putative class involved "goods" within the meaning the UCC, the trier of fact may need to examine the contracts of each member of the putative class. Individual questions of fact, therefore, may predominate over common issues. *See* Fed.R.Civ.P. 23(b)(3). It is not, however, necessary or appropriate to decide this question now.

under this section shall be commenced within three years next after the date the injury and damage occurs.

The Massachusetts version of § 2–318, which was amended in 1971 to abolish the privity of contract requirement in breach of warranty cases, does not explicitly limit its coverage to cases in which the plaintiff has suffered personal injury as a result of the defective product. Through the early 1980's, Massachusetts courts assumed that the privity requirement had been abolished for all breach of warranty causes of action regardless of the type of injury claimed by the plaintiff. *See, e.g., Burnham v. Mark IV Homes, Inc.*, 387 Mass. 575, 441 N.E.2d 1027, 1031 (1982); *Cameo Curtains, Inc. v. Philip Carey Corp.*, 11 Mass.App.Ct. 423, 416 N.E.2d 995, 998 (1981).

Thereafter, however, "several opinions [ ] brought Massachusetts law into accordance with the majority of states by making it clear that § 2–318 does not abolish the privity requirement when the plaintiff seeks to recover solely economic damages." *Hadar I*, 886 F.Supp. at 1097. In 1988, the First Circuit held that § 2–318 "is designed to cover breach of warranty actions that are in essence products liability actions, and is not designed as an alternative for contractually based warranty claims." *Wilson v. Hammer Holdings, Inc.*, 850 F.2d 3, 7–8 (1st Cir.1988). The court noted that the official comment to the 1973 amendment of § 2–318 suggested that the section should have the same statute of limitations period as tort actions and contract actions involving personal injuries, finding in the comment "an indication that at least the primary purpose of § 2–318 is to govern actions involving personal injuries . . . ." The *Wilson* court declined, however, to decide whether § 2–318 governs breach of warranty causes of action where the plaintiff seeks solely economic damages.

In 1989, in *Bay State–Spray*, 533 N.E.2d at 1353, the Massachusetts SJC found that breach of warranty actions seeking only economic loss are contract-based and are governed by the limitations period provided by M.G.L. ch. 106, § 2–725, while breach of warranty actions seeking to recover for physical injuries are tort-based and governed by

the limitations period provide by § 2–318. Like the First Circuit's opinion in *Wilson*, 850 F.2d at 8, the *Bay State–Spray* court based its finding on the congruence between § 2–318 and tort concepts, as well as on the fact that § 2–318's statute of limitations parallels the tort statutes of limitations period. Because *Bay State–Spray* held that § 2–318 governs only tort-based actions, the traditional rule requiring privity in breach of warranty actions appeared to continue to govern contract-based actions. *See Hadar I*, 886 F.Supp. at 1097.

In *Jacobs v. Yamaha Motor Corp.*, 420 Mass. 323, 330, 649 N.E.2d 758 (1995), however, the Massachusetts SJC rejected *Bay State–Spray*'s determination that the initial goal of providing remedies for personal injuries caused by breach of warranty should wholly limit the relief available under § 2–318 to buyers of substandard goods in contract-based causes of action. In *Jacobs* a buyer of a defective motorcycle sued the manufacturer and dealer for breach of implied warranty of merchantability. At trial, the judge permitted the plaintiff to amend his complaint to add a claim pursuant to M.G.L. ch. 93A ("ch. 93A") for deceptive and unfair trade practices. Subsequently, the trial court found that the defendant manufacturer violated ch. 93A. On appeal, the SJC considered whether the defendant could properly be held liable for breach of the implied warranty of merchantability despite the lack of privity, concluding that such a finding would support the trial judge's ruling that the defendant had violated ch. 93A. *Id.*

The court upheld the plaintiff's breach of implied warranty of merchantability claim despite the fact that plaintiff lacked privity with the motorcycle manufacturer. In reaching this conclusion, the court explicitly limited its ruling to breach of implied warranty claims brought against manufacturers of consumer goods, reasoning that "*contract-based warranty claims involving commercial transactions* may generally call for different treatment than tort-based warranty claims." *Id.* at 330, 649 N.E.2d 758 (emphasis added)(citing with approval John C. Bartenstein, *Recent Developments in Commercial War-*

*ranty Law,* 35 B.B.J. 4, 6 (May/June 1991)).[13] In drawing the distinction between buyers of consumer goods and buyers of commercial goods, the *Jacobs* court also observed that:

contract-based warranty-claims of buyers of *consumer goods* themselves deserve separate consideration because of the special legislation affecting them. We respond to this legislative treatment by implementing the purposes of 2–318 and recognizing the right of a *buyer of consumer goods* to sue the manufacturer directly for a breach of implied warranty of merchantability.

*Id.* at 330–331, 649 N.E.2d 758 (emphasis added). The *Jacobs* decision has been read as creating an exception to the requirement of privity in suits against remote manufacturers only for plaintiffs who purchase consumer goods. *Hadar v. Concordia Yacht Builders. Inc.* 1997 WL 436464, *4–5 (1997)("*Hadar II* "). In *Hadar II,* the court held that "nothing in the *Jacobs* decision supports the proposition that contract-based breach of warranty claims arising in the context of commercial transactions are subject to the relaxed privity requirement." *Id.* at *4.

 Upon review of the foregoing authorities, this court agrees with the reasoning in *Hadar II* that commercial plaintiffs must allege privity to maintain a breach of warranty action against a manufacturer. Consumer goods are those "used or bought for use primarily for personal, family or household purposes." *See* M.G.L. ch. 106,

§ 9–109. PFRI does not fall in this category. The Flint Village plaintiffs, therefore, are commercial plaintiffs. Accordingly, *Jacobs* does not apply to this case, and privity is required. Because the Flint Village plaintiffs have not alleged privity, their breach of express and implied warranty claims are being dismissed.

### 2. *Sebago Adequately Alleges its Warranty Claims*

 Defendants allege that Sebago's breach of warranty claims fail for lack of privity, that Sebago's breach of express warranty claim also fails for lack of reliance, and that, in any event, Maine's four-year statute of limitations bars the warranty claims. For the reasons described in the discussion of the fraud claim, *supra,* Part IV.A., Sebago's breach of express warranty claim against Manville is being dismissed because the plaintiffs do not allege any representations attributable to Manville that could constitute the basis of an express warranty. The defendants' other contentions, however, are not meritorious.[14]

### a. *Under Maine law, Privity is Not Required to Maintain Breach of Warranty Claims*

 Under Maine's statutory scheme, express warranties are created pursuant to 11

---

**13.** Bartenstein writes that:

there is neither a proper statutory basis nor a legitimate policy reason for eliminating the requirement of privity in a commercial breach-of-warranty action. To impose tort-like obligations on a remote manufacturer for economic loss defeats the legitimate contractual expectations on which the manufacturer's pricing and other decisions are made.

*Recent Developments in Commercial Warranty Law,* 35 B.B.J. 4, 10 (May/June 1991)

**14.** Like Massachusetts, Maine courts recognize that contracts for the sale of real estate and the buildings attached to the real estate fall outside the purview of the U.C.C. *Lucien Bourque, Inc. v. Cronkite,* 557 A.2d 193, 195 (Me.1989); *Smith v. Urethane Installations, Inc.,* 492 A.2d 1266, 1268 (Me.1985); *Dehahn v. Innes,* 356 A.2d 711, 716 (Me.1976)("[I]t is apparent that the Code is concerned only with the transfer of title to goods and

not with the transfer of title to realty which must be left 'to the courts and other legislation.' ").

In *Urethane Installations,* 492 A.2d at 1268–69, the Maine SJC held that a contract for insulating a home was predominately a service contract. The court reasoned that:

The nature of the "goods," foam insulation, is difficult to conceptualize in the absence of installation. A major part of the contract price would appear to be attributable to labor. The terms of the contract—"insulating all vertical walls and slant ceilings"—suggest labor and service, rather than the insulation material, are the predominant features of this agreement. *Id.* The Complaint does not illuminate whether goods or services formed the predominant feature of the contract between the former owner of Sebago's building and the roofing installation company that installed PFRI, or the contract between Sebago and the former owner of its building

M.R.S.A. § 2–313.[15] A warranty that goods are merchantable is implied in every sale of goods. 11 M.R.S.A. § 2–314.[16] The Maine SJC has not expressly decided whether a commercial plaintiff must allege privity to maintain a breach of warranty claim. Accordingly, the question to be addressed is again whether it is reasonably clear that the Maine SJC, if confronted with the facts of this case, would hold that privity is required to recover economic loss due to the breach of the implied warranty of merchantability, notwithstanding the express language of 11 M.R.S.A. § 2–318 (1995). *See Lyons*, 30 F.3d at 245; *Martel*, 992 F.2d at 1247.

Maine's version of § 2–318, which differs from the Massachusetts' version, provides that:

Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer, seller or supplier of goods for breach of warranty, express or implied, although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods.

11 M.R.S.A. § 2–318 (1995); *see Stanley v. Schiavi Mobile Homes, Inc.*, 462 A.2d 1144, 1147 n. 4 (Me.1983) (noting that lack of privity is no defense in breach of implied warranty actions).

The defendants contend that *Ouellette v. Sturm, Ruger & Co., Inc.*, 466 A.2d 478, 483 (Me.1983) and *Oceanside*, 659 A.2d at 270–71, when read together, support the proposition that the Maine courts would, following the Massachusetts courts, hold that a commercial plaintiff must allege privity to state a breach of warranty claim. In *Ouellette*, the Maine SJC, interpreting § 2–318, held that "the non-contractual liability resulting from the elimination of privity and premised upon a status measured by reasonable foreseeability sounds in tort rather than in contract." 466 A.2d at 483. In *Oceanside*, 659 A.2d at 270, the Maine SJC, in adopting the economic loss doctrine, held that claims seeking purely economic loss for damage to a building were governed by the four-year statute of limitations period for contract-based claims provided by § 2–725. Defendants reason that because *Ouellette* held that § 2–318 applies to non-contractual claims, and *Oceanside* held that claims seeking purely economic loss were governed by the statute of limitations period for contract-based claims, the plaintiffs in this case cannot invoke the relaxed privity rule of § 2–318.

Although the defendants' reasoning has a certain logical appeal, it does not withstand scrutiny. More specifically, despite the Maine SJC's decision in *Ouellette*, its more recent decision in *Oceanside* cannot be read to require privity because the plaintiffs in *Oceanside* lacked privity and nevertheless were permitted to pursue recovery under a warranty theory. 659 A.2d at 269–71.

In *Oceanside*, the plaintiffs, owners of condominiums and a condominium association, brought a class action on behalf of all condominium owners against a manufacturer of windows used in the construction of the condominium units. *Id.* at 269. Although the *Oceanside* court did not discuss the issue of privity, Oceanside can only be read to indi-

---

**15.** 11 M.R.S.A. § 2–313 provides in pertinent part:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

\* \* \* \* \* \*

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

11 M.R.S.A. § 2–313 (1964).

**16.** Section 2–314 provides in pertinent part that:

(1) Unless excluded or modified by section 2–316, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must at least be such as (c) Are fit for the ordinary purposes for which such goods are used. . . .

cate that no privity existed between the plaintiffs and the defendant manufacturer. As the *Oceanside* court observed, the plaintiffs "purchased finished condominium units, not individual components of the units." *Id.* at 271. Because the windows were integrated into the finished condominium units, the *Oceanside* court held that any damage resulting from defects in the windows was damage to the product itself. Therefore, the plaintiffs' claims were precluded by the economic loss doctrine. The court, however, expressly stated that the plaintiffs' claims for economic damages were "properly addressable under a warranty theory." *Id.*

The situation in *Oceanside* parallels the situation in this case precisely. Like the plaintiffs in *Oceanside,* Sebago "purchased [a finished building], not individual components of the [building]." *See id.* at 271. Similarly, like the plaintiffs in *Oceanside,* the economic loss doctrine bars Sebago's negligence and strict liability claims. It follows, then, that Sebago's claims for economic damages "are properly addressable under a warranty theory." *See id.*

While the *Oceanside* court's decision makes it reasonably clear that the Maine SJC would find that a lack of privity would not bar the plaintiffs' breach of implied warranty of merchantability claim, other factors bolster this conclusion. In *Sullivan v. Young Bros. & Co., Inc.,* 91 F.3d 242, 249 (1st Cir.1996), for example, the First Circuit, applying Maine law, affirmed the finding of the district court allowing recovery by a lobster boat owner under theories of negligence against the manufacturer of the boat's wet exhaust system, with whom he was not in privity. There, the court unambiguously held that a lack of privity did not bar the plaintiff's breach of warranty claim. *Id.* The Defendants contend that the *Sullivan* court expressly declined to take a position on whether the plaintiff's loss constituted purely economic loss under *Oceanside,* and that,

therefore, *Sullivan* is not controlling on this issue. In declining to take such a position, however, the *Sullivan* court limited its comments to the plaintiff's negligence and strict liability claims, and did not qualify its holding with regard to the plaintiff's breach of warranty claims.[17]

In addition, unlike Massachusetts' version of U.C.C. § 2–318, the Maine version does not purport to establish that "[a]ll actions under this section shall be commenced within three years next after the date the injury and damage occurs." *See* M.G.L. ch. 106, § 2–318. The *Bay State–Spray* court relied in part on the congruence between the three-year statute of limitations period in § 2–318 and the identical statute of limitations period for tort claims. Such a congruence does not exist in Maine's statutory scheme.

In view of *Sullivan* and the *Oceanside* court's decision to permit the plaintiffs in *Oceanside* to proceed with a warranty claim in the absence of privity, it is reasonably clear that the Maine SJC would allow Sebago to bring its breach of express and implied warranty claims in the absence of privity.

b. *Sebago Adequately Alleges a Breach of Express Warranty Against Koppers*

■■ Defendant Koppers also challenges Sebago's breach of express warranty claim on the basis of reliance. Preliminarily, Koppers did not contest that its representations constituted express warranties. In its brochure, Koppers represented, among other things, that its "Koppers Rx" is "a foam plastic insulation guaranteed to retain its 'R' value for 20 years. Our 8.3 'aged' 'R' value per inch is the best in the industry ... and Koppers Rx Insulation will retain its 'R' value into the next century. We guarantee it." Compl., ¶ 8. Viewing this language and the other representations quoted in the Complaint in the light most favorable to the plaintiffs, it is possible that the quoted language

---

**17.** The *Sullivan* court stated in pertinent part that:

> We take no position on ... the question of whether Sullivan's loss constitutes purely "economic loss" under Oceanside. We note in passing that, with respect to [the defendant's] liability under theories of *negligence or strict li-*

*ability,* we express no opinion as to the district court's assertion that "the [Maine] Law Court has not decided th[e] issue" of the economic loss doctrine's applicability to such theories. 91 F.3d at 253 n. 4 (citations omitted and emphasis added).

constitutes an affirmation or promise within the ambit of 11 M.R.S.A. § 2–313(1).

■ To establish a breach of express warranty claim, however, the plaintiff must demonstrate that the express warranty constituted a basis of the bargain between the seller and the buyer. *Sullivan,* 91 F.3d at 249; *Phillips v. Ripley & Fletcher Co.,* 541 A.2d 946, 950 (Me.1988); *see also Cuthbertson v. Clark Equipment Co.,* 448 A.2d 315, 321 (Me.1982). To demonstrate that the express warranty constituted a basis of the bargain, the plaintiff must demonstrate that the buyer relied on the warranty.[18] *Phillips,* 541 A.2d at 950.

As the First Circuit recently decided, however, it is not necessary for Sebago itself to allege reliance. In *Sullivan,* the First Circuit dismissed "as meritless [the defendants'] claim that [the plaintiff] may not enforce the express warranty because there was no evidence proffered that [the plaintiff] 'ever saw' the [product] prior to litigation, let alone relied on [the defendants'] representations." 91 F.3d at 249. The *Sullivan* court first determined that, although the district court had not discussed reliance in its decision, the court could have reasonably inferred that the purchaser relied on the representations when purchasing the product. *Id.* at 248–49. The First Circuit also based its decision by reference to 11 M.R.S.A. § 2–318. *Id.* (citing *Stanley,* 462 A.2d at 1147 n. 4). The *Sullivan* court also found that, although no privity existed between the plaintiff and defendant because the plaintiff did not purchase the product directly from the defendant, the plaintiff "was certainly a person whom [the defendant] might reasonably have expected to use, or be affected by, the [product]." *Id.* (citing 11 M.R.S.A. § 2–318).

The analysis involved in deciding whether Sebago has stated a breach of warranty claim, therefore, requires two steps. First, it must be determined whether the defendant's representations constituted the "basis of the bargain" by determining whether the purchaser of the PFRI relied on the defendants' representations. Second, it must be determined whether the plaintiff was a person whom the defendants might reasonably have expected to use, or be affected by, the PFRI.

The plaintiffs allege that the defendants " 'fraudulently induced' the manufacturer of the roof membrane of Sebago's building ... to approve the use of PFRI with their membrane." Compl., ¶ 74. Accepting the plaintiffs' allegations in the complaint as true and drawing all reasonable inferences from them indicates that the purchaser of the PFRI installed in Sebago's building relied on the defendants' representations when purchasing the PFRI. *See* Compl., ¶ 74.

In addition, the plaintiffs in this case are persons whom the defendants might reasonably have expected to use, or be affected by the PFRI. *See Sullivan,* 91 F.3d at 250. Assuming the truth of the plaintiffs' allegations for present purposes, the defendants sold the PFRI with the knowledge that its latent defects would eventually cause corrosion and concomitant damage to the structural integrity of the buildings in which it was installed. The defendants should have reasonably expected that the owner of a building with a PFRI insulated roof would be affected by the defective PFRI, whether the owner was an initial owner or, as in the case of Sebago, a subsequent owner. Accordingly, Sebago's breach of express warranty claim survives the challenge based on reliance.

c. *The Alleged Fraudulent Concealment Tolls The Statute Of Limitations*

■ Defendants assert that the statute of limitations bars Sebago's warranty claims. In the absence of personal injury, the statute of limitations applying to breach of warranty claims is four years from the date of accrual, which occurs "when tender of delivery is made." *Oceanside,* 659 A.2d at 271 (citing 14 M.R.S.A. § 752).[19] Under Maine law, howev-

---

18. As noted in *Phillips,* comments to 11 M.R.S.A. § 2–313 suggest that "the requirement that the affirmation become part of the 'basis of the bargain' is meant to continue the uniform sales act requirement that the purchaser must show reliance on the affirmation in order to make out a cause of action for breach of warranty." 541 A.2d at 950 (internal citations omitted).

19. 11 M.R.S.A. § 2–725 provides in pertinent part that:

(1) An action for breach of any contract for sale must be commenced within 4 years after

er, 14 M.R.S.A. § 859 provides that a plaintiff may commence an action within six years after it discovers a breach of warranty action where the defendant fraudulently conceals the existence of the cause of action.[20] *See Akins v. Firstbank, N.A.,* 415 A.2d 567, 569 (Me.1980). In *Akins,* the court held allegations of an unconcealed fraud that could not have been discovered by the exercise of due diligence were sufficient to survive a motion to dismiss based on statute of limitations grounds. *Id.* In the instant case, the Second Amended and Consolidated Complaint alleges fraud and actionable nondisclosure in the defendants' sale and marketing of PFRI. The plaintiffs, therefore, are entitled to an opportunity to prove their allegations. Accordingly, Sebago's breach of implied warranty claim survives the challenge based on statute of limitations grounds. *See id.; Webb v. Haas,* 665 A.2d 1005, 1008 (Me.1995) (holding that it is not generally appropriate to decide on basis of pleadings whether defendant's conduct was fraudulent for limitations purposes).

E. Deceptive Trade Practice Claims (Count VIII)

1. *The Flint Village Plaintiffs' Ch. 93A Claim*

Defendants challenge the Flint Village plaintiffs' ch. 93A claim on the bases of reliance and the economic loss doctrine. Neither challenge is meritorious. The plaintiffs contend that G.L. c. 93A, § 2, was violated by the defendants' misrepresentations and omissions concerning the performance of PFRI and its defects. For the reasons described in the discussion of fraud, *supra,* Part IV.A., the defendants' reliance argument fails with regard to Koppers because the Flint Village plaintiffs adequately allege reliance. However, the defendants' reliance argument also fails with regard to both defendants because Massachusetts does not require reliance to state a ch. 93A claim.

 To establish a claim pursuant to ch. 93A, §§ 2 and 11, "proof of actual reliance on a misrepresentation is not required so long as the evidence warrants a finding of a causal relationship between the misrepresentation and the injury to the plaintiff." *Fraser Engineering Co., Inc. v. Desmond,* 26 Mass.App.Ct. 99, 104, 524 N.E.2d 110 (1988); *see also Heller Financial v. Ins. Co. of North America,* 410 Mass. 400, 409, 573 N.E.2d 8 (1991) ("[W]hile Heller need not show actual reliance on the misrepresentation, the evidence must warrant a finding that a causal relationship existed between the misrepresentation and the injury.") (citations omitted). For the reasons described in the discussion of RICO causation, *supra,* Part III.C., the plaintiffs have established a causal connection between the defendants' acts and the plaintiffs' alleged injuries sufficient to withstand the defendants' motions to dismiss.

 In addition, because both plaintiffs have stated a RICO claim against both defendants, and because the Flint Village plain-

---

the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered. A cause of action for personal injuries arising under this Article for breach of warranty occurs when the injury takes place and is governed by the limitation of action period under Title 14, section 752.

 \* \* \* \* \* \*

(4) This section does not alter the law on tolling of the statute of limitations nor does it apply to causes of action which have accrued before this Title becomes effective.

**20.** 14 M.R.S.A. § 859 provides in pertinent part that:

If a person, liable to any action mentioned, fraudulently conceals the cause thereof from the person entitled thereto, or if a fraud is committed which entitles any person to an action, the action may be commenced at any time within 6 years after the person entitled thereto discovers that he has just cause of action.....

tiffs have stated a fraud claim against Koppers, the economic loss doctrine does not bar their ch. 93A claim. *See Canal Elec. Co. v. Westinghouse Elec. Corp.*, 973 F.2d 988, 998 (1st Cir.1992) (holding that the economic loss doctrine "restricts liability for this type of *negligently-caused economic harm*, though, at the same time, it permits recovery for such harm in special circumstances; for example, where the defendant engages in an *intentional tort* ....") (emphasis added).

In addition, it is well established that ch. 93A is a "statute of broad impact which creates new substantive rights" and provides relief which is "in addition to, and not an alternative to, traditional tort ... remedies." *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 693, 322 N.E.2d 768 (1975). A practice or act is unfair within the meaning of ch. 93A if it is "within the penumbra of a common law, statutory or other established concept of unfairness." *Heller*, 410 Mass. at 408, 573 N.E.2d 8. Given the Massachusetts courts' broad interpretations of unfair and deceptive trade practices, the defendants have not demonstrated that there exists no set of facts which, if proven by the plaintiffs, would bring defendants' alleged conduct within the scope of ch. 93A.

### 2. *Maine's Uniform Deceptive Trade Practices Act*

Sebago seeks a mandatory injunction pursuant to Maine's Uniform Deceptive Trade Practices Act ("UDTA"), ordering the defendants to remove the defective PFRI from its premises. *See* 10 M.R.S.A. §§ 1211 *et seq.* The defendants contend that Sebago's claim fails because the UDTA only provides injunctive relief to guard against future harm rather than to remedy a past wrong. This contention is correct.

The UDTA provides that "[a] person *likely to be damaged* by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable." 10 M.R.S.A. § 1213 (emphasis added); *see also Sebago Lake Camps, Inc. v. Simpson*, 434 A.2d 519, 521 (Me.1981) (holding that the UDTA is not intended to provide a separate remedy for deceptive trade prac-

tices independent of the common law, but, rather, codifies the common law and incorporates equity principles). Sebego asserts that the allegedly continuing degradation of the PFRI in its roof constitutes "future harm" for which injunctive relief is appropriate. However, the plaintiffs concede that the defendants no longer conduct their allegedly deceptive trade practices because they allege that defendants have not sold PFRI since 1992. Compl., ¶ 30. There is no authority for the proposition that failing to remove an allegedly defective product from a plaintiff's premises constitutes a deceptive trade practice within the meaning of the UDTA. *See* 10 M.R.S.A. § 1212. Sebago, therefore, has not demonstrated that it is *likely to be damaged* by a deceptive trade practice. *See* 10 M.R.S.A. § 1213.

Accordingly, Sebago's UDTA claim is being dismissed, recognizing that the dismissal of the UDTA claim does not preclude Sebago from requesting other forms of injunctive relief, consistent with the equitable powers of this court, at a later stage in this case.

## V. *ORDER*

Accordingly, it is hereby ORDERED that:

1. Defendants' motions to dismiss (Docket Nos. 78, 80, 82, 84) Count I, the RICO claim, are DENIED.

2. Defendants' motions to dismiss (Docket Nos. 78, 80, 82, 84) Count II, the RICO conspiracy claim, are DENIED.

3. Defendant Koppers' motions to dismiss (Docket Nos. 78, 80, 82, 84) Count III, the fraud claim, are DENIED as to the Flint Village plaintiffs and ALLOWED as to Sebago.

4. Defendant Manville's motions to dismiss (Docket Nos. 78, 80, 82, 84) Count III, the fraud claim, are ALLOWED.

5. Defendants' motions to dismiss (Docket Nos. 78, 80, 82, 84) Count IV, the negligent misrepresentation claim, are ALLOWED.

6. Defendants' motions to dismiss (Docket Nos. 78, 80, 82, 84) Count V, the negligence claim, are ALLOWED.

7. Defendant Koppers' motions to dismiss (Docket Nos. 78, 80, 82, 84) Count VI, the breach of express warranty claim, are DENIED as to Sebago and ALLOWED as to the Flint Village plaintiffs.

8. Defendant Manville's motions to dismiss (Docket Nos. 78, 80, 82, 84) Count VI, the breach of express warranty claim, are ALLOWED.

9. Defendants' motions to dismiss (Docket Nos. 78, 80, 82, 84) Count VII, the breach of implied warranty claim, are DENIED as to Sebago and ALLOWED as to the Flint Village plaintiffs.

10. Defendants' motions to dismiss (Docket Nos. 78, 80, 82, 84) Count VIII, the deceptive trade practice claim, are DENIED as to the Flint Village plaintiffs and ALLOWED as to Sebago.

11. Defendants' motions to dismiss (Docket Nos. 78, 80, 82, 84) Count IX, the strict product liability claim, are ALLOWED.

12. A scheduling conference will be held on May 12, 1998, at 4:00 p.m. The parties shall comply in connection with that conference.